WALTERS   v.   LARSON et al.
No. 22006.

Kansas City Court of Appeals.
Missouri.
June 7, 1954.

Walter A. Raymond, Kansas City, for appellants.

Wm. Icenogle, Stubbs, McKenzie, Williams & Merrick, Kansas City, for respondent.

BROADDUS, Judge.

This is an action for fraud and deceit. Plaintiff had a verdict and judgment against defendants for $5,000 actual and $1,000 punitive damages. Defendants have appealed.

Plaintiff's petition filed November 8, 1950, alleged that on August 16, 1950, defendants sold to plaintiff the goods, machinery and equipment located at 2815–17 Southwest Boulevard, Kansas City, Missouri, which equipment was for the manufacture of cement blocks; that relying on the statements of the defendants plaintiff purchased said property for $5,900, "$4900 of which was paid to the defendants in cash and $1000 of which was paid by plaintiff's promissory note, and that plaintiff paid $100 on said note"; that on August 16, 1950, defendants executed and delivered to plaintiff their bill of sale which covered the machinery and equipment which defendants induced plaintiff to purchase; that said property was not the property of defendants, but rather the property of the Southwest Block Company, a corporation, and that defendants had no right or authority to sell the same, all of which was well known to the defendants; that defendants represented to her that said goods and equipment were free and clear of any mortgages, liens or encumbrances; that there existed at the time of the aforesaid transaction a chattel mortgage in which the goods purchased by plaintiff were pledged to the Fidelity State Bank, Kansas City, Kansas, by the Southwest Block Company, to secure a promissory note of the corporation, all of which was well known to the defendants; that plaintiff relied upon the false and fraudulent representations of the defendants, to-wit: that the machinery and equipment which she was induced to buy was their property, and that the same was free and clear of any lien or encumbrance, all to plaintiff's damage in the sum of $5,900. The petition alleged that the acts of defendants as above set out were unlawful, malicious, fraudulent, wilful and deceitful and prayed for punitive damages in the sum of $10,000.

The answer of defendants was a general denial except that defendants admitted that they sold to plaintiff the property mentioned in her petition and that they delivered to her a bill of sale, as alleged in the petition.

Defendant Phipps organized the Southwest Block Company as a Missouri Corporation. Although he was the owner of all the stock he put one qualifying share in the name of his wife and another in the name of his lawyer.

Defendant Larson was an expert machinist. On March 8, 1950, Phipps leased the plant to Larson to operate on a rental basis of ½ cent per block to Phipps. Larson added two block machines of his own to the equipment of the plant.

Phipps was the owner of a group of lots. He had borrowed $3,178 from the Fidelity State Bank of Kansas City, Kansas. After reducing the loan to $2,342.14, on September 1, 1949, he borrowed $1,000 more from the bank and gave a chattel mortgage on the equipment of the Southwest Block Company to the bank for that amount. This new loan was also secured by a deed of trust on the lots. The note was signed by Phipps individually as well as by the Block Company.

Plaintiff, Mrs. Walters, is a widow. She testified that her attention was first called to the fact that the concrete block plant was for sale when an advertisement appeared in the newspaper. The advertisement contained a telephone number. When she called the number she found that it was that of defendant Phipps. In later conversations with Phipps he told plaintiff that "he owned the equipment" and that "it was free, no mortgage on it." In payment of the purchase price plaintiff gave a check dated August 17, 1950, for $4,900 payable to defendants Phipps and Larson, which they later cashed. She also signed a note for $1,020; "the $20 was for taxes." Plaintiff was given a bill of sale to the equipment executed by both defendants, and in which they stated that they were the owners and that the same was unencumbered.

The date of the sale was August 16, 1950. Soon after plaintiff went into possession of the property "letters began coming in to the Southwest Block Company." They contained "a lot of bills * * * and one in particular from the May Company, I think for $348, or something, and then a lot more came on top * * *." Plaintiff testified that the name Southwest Block Company was never mentioned in any of the negotiations with defendants; that the first knowledge she had that the property was mortgaged and in the name of the Southwest Block Company was when she received a call from a Mr. Pearson who was connected with the Fidelity State Bank of Kansas City, Kansas. Upon receiving that information from Mr. Pearson plaintiff called defendant Phipps on the telephone and "told him, asked for my money back." Phipps said to her, " 'Oh, there is some mistake.' He said 'I will look into it and I'll straighten it out;' and that is the last time that I could ever get hold of him. I never could talk to him afterwards." Plaintiff stopped making concrete blocks and later closed the plant.

Plaintiff called as a witness one Joe Phillips, who testified that he was present when the sale took place. His reason for being present was that he was going to operate the plant for Mrs. Walters. He testified that "Mr. Phipps said there was no mortgage or any encumbrance against the place * * * and he said he was the owner of it." Phillips further testified that after operating the plant for "six or seven weeks" he talked to Mr. Pearson "the banker in Kansas City, Kansas." The latter informed the witness of the ownership of the property and that it was encumbered. After receiving such notice Phillips closed and locked the plant.

Defendants' testimony was that at a meeting of the shareholders and directors of the Southwest Block Company all of the assets of the corporation were turned over to Phipps and he assumed all of its obligations. Defendants' attorney advised them to sell the property and helped close the deal with plaintiff.

Defendant Phipps testified that on August 14, 1950, he went to the bank. At that time approximately $800 had been paid on the loan. The banker, Mr. Pearson, told Phipps the bank had enough other collateral and would release the mortgage on the equipment and for him to go ahead and sell it. Phipps stated that he relied upon what the banker told him. Defendant, Larson, operating as Allied Builders had kept his bills paid and there was no encumbrance on his block machines. Phipps testified that when plaintiff called him and complained

about the mortgage he got in touch with the bank and was advised that it had "been taken care of." The records in the office of the Recorder of Deeds disclosed that the chattel mortgage was released of record on October 13, 1950. However, plaintiff was not aware of that fact. The original note against the lots was paid December 8, 1950. Phipps also testified that he paid all of the bills of the Southwest Block Company.

Defendants first contend that the court erred in refusing their motion for a directed verdict offered at the close of all the evidence because "A. The evidence was insufficient for submission to the jury on the issue of fraudulent representations as to defendants' ownership and right to sell the personal property involved."

■ In passing upon this question we must view the evidence in the light most favorable to plaintiff, giving her the benefit of every inference reasonably deducible therefrom and disregarding testimony and inferences adverse to her.

. The evidence shows that the Southwest Block Company did not file its annual return and make the anti-trust affidavit due March 31, 1950. However, its charter was not forfeited for that reason until January 1, 1951, over four months after the transaction with plaintiff had taken place. Thus, the cases cited by defendants involving the powers of directors of a corporation whose charter has expired by operation of law have no application here.

Defendants' evidence shows that the corporation, Southwest Block Company, did not function as such after March 31, 1950. The attorney for the Company when on the stand was asked by the Court: "How did you handle it? A. It was handled informally, Judge. We just had a meeting and decided to dissolve the corporation, and as of March 31, 1950, ceased to do business as a corporation, forfeited the charter, and turned the assets and liabilities of the corporation over to Mr. Phipps. Q. (By the Court) And there are no records? A. No, no records were made." Later the witness was asked by plaintiff's counsel: "Now, you are not going to tell this jury, are you, that

this corporation charter was forfeited at any time during 1950? A. No, but I will say the corporation stopped doing business as of March 31, 1950. Q. And now you are telling us that the corporation just went out of business? A. That is right. Q. Just died a natural death? A. That is right."

■ Our statutes provide the method by which a corporation may be voluntarily dissolved. (See sections 351.460, 351.465, 351.470, 351.475 and 351.480, RSMo 1949, V.A.M.S.) In this instance no attempt was made to comply with the statutes. The general rule is that the legal title to corporate property is in the corporation. 18 C.J.S., Corporations, § 512, p. 1189. In the instant case, when the alleged sale to plaintiff took place on August 16, 1950, the legal title to the equipment was in the Southwest Block Company.

Under "B" of their first point defendants say: The evidence was insufficient for submission to the jury on the issue of fraudulent representations as to encumbrances on the property involved."

Defendant Phipps testified as follows: "Q. As a matter of fact, all the equipment and fixtures of the Southwest Block Company was mortgaged to the Fidelity State Bank in August, 1950, is that right? A. Yes. Q. When was that mortgage given to the Fidelity State Bank? A. I imagine it would be somewhere around four to six months previous to that."

While on the stand defendant Larson was asked: "Q. And you knew that there was a mortgage on your property with the Fidelity State Bank when you sold to Mrs. Walters, didn't you? A. Well, there was— Q. Just answer yes or no. A. Yes."

In 37 C.J.S., Fraud, § 56, p. 330, it is stated: "False and positive statements as to title and encumbrances are usually regarded as actionable misrepresentations of fact * * *." In the instant case there was substantial evidence that the representations were false and material and were relied upon by Mrs. Walters. Thus the

court did not err in overruling defendants' motion for a directed verdict.

■ Defendants next contend that the court erred in submitting the issue of compensatory damages to the jury. The evidence is undisputed that plaintiff paid to defendants the sum of $4,900 at the time the bill of sale was delivered to her. Subsequently she paid to them the additional sum of $100. After plaintiff learned of the encumbrance on the property and of the questionable title she had received, she demanded of defendant Phipps the return of her money. This, we think she had a right to do under the circumstances. Not being able "to get hold" of Phipps again, or "to talk to him afterwards," she and her foreman closed the plant. The question of whether or not plaintiff sustained actual damages was one for the jury.

■ Defendants also say that plaintiff's Instruction No. 2 is erroneous in that it fails to inform the jury that the legal measure of damages is the difference between the value of the property as represented and the actual value of the property at the time of the sale to plaintiff.

In the late case of Schroeder v. Zykan, 255 S.W.2d 105, by the St. Louis Court of Appeals, the defendant therein made the identical contention which defendants here assert. After referring to the cases cited by the defendant in that case the court said, 255 S.W.2d loc. cit. 110:

"Those cases, however, do not control in the instant situation. Here the purchaser disaffirmed the contract upon learning of the fraud, repudiated the transaction, and attempted to make restitution to the seller. Under such circumstances the applicable measure of damages differs from that proposed by defendant.

"In 37 C.J.S., Fraud, § 143, pp. 478, 480, it is said:

" 'The rule that a defrauded purchaser's damages are to be measured by the difference between the real and represented values of the property purchased does not apply where, because of the peculiar circumstances of the case involved, such difference fails to measure accurately the loss sustained, as where the purchaser rescinds and returns the property received, or where he received nothing of value; but in such cases he may properly recover the amount paid with interest from the date of payment, * * *.'

Dunham v. Tenth St. Garage & Sales Co., Mo.App., 94 S.W.2d 1096; Heed v. Pierce, 8 Mo.App. 569; Cramer v. Overfield, 115 Kan. 197, 222 P. 85; Anderson v. Heasley, 95 Kan. 572, 148 P. 738; Liles v. Pentecost, 213 Ala. 413, 105 So. 198."

The Dunham case cited above was by this Court. The instruction was correct under the facts of the instant case.

Finally, defendants contend that the court erred in giving plaintiff's Instruction No. 3 submitting the issue of punitive damages. They assert that there was no evidence to justify such submission.

■ The evidence tended to show that defendants knew that the property sold to plaintiff was encumbered and yet represented to her that it was not—making an affidavit to that effect. It is true that defendants' testimony disclosed that they acted in good faith. This, however, the triers of the fact were not bound to accept.

■■ In Jones v. West Side Buick Auto Co., 231 Mo.App. 187, 93 S.W.2d 1083, the rule relative to the allowance of punitive damages is stated, 93 S.W.2d loc. cit. 1088: " * * * the courts of this state seem now to be committed to the proposition that in cases of fraud and deceit punitive damages may be awarded where legal malice is present. Luikart v. Miller, Mo.Sup., 48 S.W. 2d 867; Finke v. Boyer, 331 Mo. 1242, 56 S.W.2d 372. Moreover, by legal malice the courts have in mind simply the accepted theory of the intentional doing of a wrongful act without just cause or excuse, and not the necessity for the showing of any spite or ill will, or that the particular act was willfully or wantonly done. Luikart v. Miller, supra; Lampert v. Judge & Dolph Drug Co., 238 Mo. 409, 141 S.W. 1095, 37 L.R.A.,N.S., 533, Ann.Cas.1913A, 351."

There was ample evidence upon which to base the instruction.

Defendants also say that the instruction did not confine the allowance of punitive damages to issues justifying such damages but gave the jury a roving commission to punish defendants for innocent violations. The instruction confined the jury to the acts and conduct of defendants, "as submitted in these instructions." And by plaintiff's main instruction the jury was required to find "that defendants represented to plaintiff that they were the owners of a certain plant and equipment for the manufacturing of concrete blocks * * * and that the said plant and equipment was not mortgaged * * *." Thus, it is apparent that there is no merit in this contention.

Finding no error prejudicial to defendants the judgment is affirmed.

All concur.