Stewart Kippling SALMON, a Minor, by Mary Jo Salmon, his natural guardian and next friend (Plaintiff), Respondent,

v.

W. A. BROOKSHIRE (Defendant), Appellant.

No. 22517.

Kansas City Court of Appeals.

Missouri.

April 1, 1957.

W. D. Settle, Fayette, W. A. Brookshire, Columbia, for appellant.

Fred Wesner, Sedalia, Wilbur F. Daniels, Fayette, for respondent.

HUNTER, Judge.

This is a suit for damages by fifteen-year-old plaintiff-respondent, Stewart Kippling Salmon, a minor, by his mother, Mary Jo Salmon, against W. A. Brookshire, defendant-appellant.

Plaintiff's cause of action as stated in his petition is for damages resulting to him by reason of defendant selling to him through his father, V. G. Salmon, acting as his agent, a Hereford cow, B and B Mabelle Misch 1, allegedly represented to him by defendant through plaintiff's agent-father to be a registered cow duly and properly registered with and under the rules of the American Hereford Association, when in fact, the cow was not duly and properly a registered cow with that Association, which representation defendant well knew to be false when he made it. Punitive damages also were asked by plaintiff.

In his amended answer defendant denied making any misrepresentation whatsoever to plaintiff, or to plaintiff's father-agent. He also pleaded in great detail his factual version of the transaction as he claims it occurred.

On the trial of the case at the close of plaintiff's evidence defendant filed his motion for a directed verdict, and when it was overruled, elected not to proceed further, and introduced no evidence. The jury returned a verdict for plaintiff for $1,200 actual damages, and for $1,800 punitive damages. The trial court entered its judgment accordingly. After an unavailing motion for a new trial, the defendant has appealed.

Testimony adduced on behalf of plaintiff is to the effect that V. G. Salmon, the father of plaintiff, went to defendant's farm on December 20, 1951, with Mr. Mc-

Dowell, a 4-H Club leader. Mr. Salmon was completely inexperienced with the handling or breeding of registered cattle. That day they looked at some of plaintiff's cattle that were for sale. On December 22, 1951, Mr. Salmon returned to defendant's farm. He explained to defendant that along with some other cows he wished to purchase a cow for his son Stewart, and that Stewart wanted the cow for a 4-H registered cow project. The defendant told Mr. Salmon that the particular cow they were examining was a registered animal, and was registered with the American Hereford Association in Kansas City, Missouri. Defendant also told him that the cow was a little over three years old, and was due to calve in the spring. Mr. Salmon explained to defendant that the cow was to be Stewart's and that the transfer of the title or registration certificate was to be made to Stewart. Mr. Salmon paid defendant $600 that day as the agreed upon purchase price of the cow. He testified that at the time he paid for this cow, defendant said:

"Some of the cattle didn't have tattoos and as soon as the weather broke he (defendant) would be down to tattoo them.

"Q. Did you ask him, or make some inquiry of him of what the significance of tattooing was? A. Yes, I asked him what the importance of tattooing was and he said, 'Well, it isn't too important;' that he usually used a tattoo to prove how many registered cattle he had produced. Said he started with No. 1 in the right ear, and so forth, and that a cow that had a larger number, that would show how many registered cattle he had produced.

"Q. Did you know anything about or have any knowledge of the significance of a cow having or not having a tattoo mark in her ear at that time? A. I didn't know what it was for.

"Q. Did you rely upon and believe what Mr. Brookshire told you with reference to tattooing or absence of tattooing when you were buying this cow for this boy? A. I did. I relied upon his honesty.

"Q. When was it, insofar as you can remember now, that you first learned or knew that this particular cow of Stewart Kippling's did not have any tattoo in her ear? A. I received a letter from Mr. Brookshire, I believe it was about the first part of July in 1952, telling me what tattoo number should be put in her ear, and asked me to put the tattoo in her ear, or see that it was put there."

Mr. Paul Swaffar, secretary of the American Hereford Association, testified that the application blank for registration contains a place on it for listing the tattoo number, and that the Association rules provide that tattooing shall be done before the application is submitted. The application showing a tattoo is accepted by the Association as the tattoo actually appearing in the ear of the particular animal. If it later appears there is no such tattoo, then in the records and in the eyes of the Association she ceases to be a registered animal. There is no provision for registering animals over twenty-four months of age, although possibly this could be done in some instances by special action of the board of directors. Calves born by such an unregistered cow are not eligible to be registered in the American Hereford Association.

Article II, Section 3, of the constitution of the American Hereford Association provides: "Tattoo. As a permanent means of identification, *before* an application is submitted for entry the original owner, or the agent of the original owner, shall have caused every animal represented by such application for entry to be tattooed properly and plainly in the ear, or ears, with India ink with such numerals or letters, without duplication, as he may select. Such tattoo, or tattoos, shall in all cases constitute and be considered the permanent and only means of identification of a recorded ani-

mal. Any animal subsequently found not to carry a legible tattoo may at the discretion of the board of directors be cancelled from the records and the certificates of registration therefor recalled." (Emphasis added.)

There was evidence to the effect that defendant had admitted to the Association's Board in a hearing before it that he had falsely certified that plaintiff's cow had been tattooed when he made application for her registration. On August 9, 1953 the cow's registration was ordered cancelled by the Board and certain fines were ordered against defendant. He appealed from this hearing. As a result of a subsequent hearing the fines were cancelled, but there was no change in the earlier order rescinding the registration of plaintiff's cow, which was declared by the Association to be a "grade" cow.

The defendant was called by plaintiff for cross-examination under Section 491.-030 RSMo 1949, V.A.M.S. He testified that he was a graduate of the University of Chicago Law School, with a Doctor of Jurisprudence degree; was a former State Senator; a former superintendent of schools and now practiced law and raised Hereford cattle on his farm near Columbia, Missouri. He had bought his first Hereford herd in 1930 and had joined the American Hereford Association in 1943, in which year he began registering Hereford cattle with that Association. Ever since 1943 he has maintained a registered herd under the rules and regulations of the Association, and has registered some 560 cattle with that Association over the years. He stated he first saw the printed rules of the Association in 1952, but that he knew all along that the application for registration required a tattoo for all registered cattle. He denied he knew the tattooing was required "before you disposed of the animal or at any particular time." He had registered twenty-five to thirty calves in 1951, and about the same number in 1950, and had registered a total of about 350 from 1946 to the date of this

sale in December 1951. As to the purpose for which the cow was bought defendant was asked, "Did you understand and know that Stewart Kippling was going to use this cow in connection with a registered cow and calf project with the 4-H group? A. I knew he said they were going to use it in projects, but I knew as a teacher and as an individual that you didn't, that it wasn't a requirement of registered animals, but he did want the registered animal. He wanted a good animal and a registered animal and he got a registered animal. * * *. Q. You knew that, and that was all explained to you? A. Yes, and that's why I priced these cattle the way I did." Again defendant was asked: "Q. Are you still contending—do you say now that this cow of Stewart Kippling Salmon, B and B Mabelle Misch 1, is a registered cow? A. I certainly do." Defendant testified that the sale of the cow occurred on December 24, 1951, and that he had previously told V. G. Salmon that some of his cattle had not been tattooed. He said: "I took the certificate for this cow on the 24th of December and showed him (V. G. Salmon) that certificate. It showed her age. It showed her breeding and I told him the tattoo had not been placed in her ear. I also told him I did not want the cattle taken from my farm until they were tattooed, but my tattooing outfit had been loaned to another man who was 200 miles from there, and if it was all right with him he could take the cattle and as soon as the tattooing outfit was returned that I would come over or bring it over and we could put the appropriate tattoos in the animals' ears."

With regard to calves he was asked: "Q. What is your answer as to whether or not this boy can register calves that are born from this cow since November 1953, and now? A. Well, under the rules of the Association he could register them. Whether or not they would permit it, I'm not going to say, because I couldn't say." At another point defendant testified: "Q. Is it necessary in order for a calf to be registered that the cow which is the mother

of that calf be registered? A. That is my understanding of the rules and that was the testimony of Mr. Swaffar."

There was evidence adduced by plaintiff to the effect that at the time of the trial neither plaintiff's cow, B and B Mabelle Misch 1, nor any of her three calves born after her purchase, and before the trial, were registered.

Defendant's first two contentions are that the trial court committed reversible error in overruling his motion for a directed verdict at the close of plaintiff's case for the claimed reason that no fraud or deceit was proved and the evidence failed to establish fraud, deceit, or misrepresentation on defendant's part.

▪ We are unable to agree with defendant's view of the matter. In passing upon this question we must view the evidence in the light most favorable to plaintiff, giving him the benefit of every inference reasonably deductible therefrom and disregard testimony and inferences adverse to him. Walters v. Larson, Mo.App., 270 S.W.2d 112; Baker v. Atkins, Mo. App., 258 S.W.2d 16, 22. And while it is true that fraud is, of course, never to be presumed it must be borne in mind that fraud is seldom susceptible of proof by direct evidence, but must almost invariably be shown by circumstances surrounding the transaction from which the fraud of the one charged with its commission may be reasonably inferred. Hunter v. Roberts, Mo.App., 267 S.W.2d 368; Meriwether v. Lumbard, Mo.App., 246 S.W.2d 363. There was evidence from which the jury could find that defendant represented to V. G. Salmon, as agent of plaintiff, that the cow, B and B Mabelle Misch 1, was a duly and properly registered Hereford cow under the rules and requirements of the American Hereford Association, when in fact he knew that she was not a properly registered cow with that Association because he had procured her registration through the use of an application for registration that contained his false statement that the cow then had in her ear a certain tattoo mark required by that Association's rules in order for the registration to be considered valid and proper, and thus not subject to recall and cancellation. Although defendant mentioned to V. G. Salmon something to the effect that not all of the cows being discussed for sale had the tattoo mark in their ears, there was evidence on plaintiff's behalf from which the jury could find that he so minimized the importance of and misled as to the function of the tattoo mark as to cause V. G. Salmon to believe it had nothing to do with the valid and proper registration of plaintiff's cow, and in no way would effect the validity of that registration or cause its cancellation.

▪ Defendant, in his brief, says that the testimony shows that he had not read the rules of the American Hereford Association, and believing the tattoo was only for the purpose of identification, thought that if it was placed in the ear at any time before the animal was disposed of it would meet the requirements of that Association. However, defendant had been a member of that Association ever since 1943. He had registered over 350 cows, or calves, with that Association prior to his sale of this cow to plaintiff. He testified he knew the application for registration required a tattoo for all registered cattle and that the American Hereford Association relied on the information contained in that application and issued the certificate of registration "relying on the fact that it was an animal which would fit that certificate and in the ear of which there has been a *tatto* mark placed." It is a proper part of the jury's function to pass on the credibility of this testimony of defendant. We think that on the evidence adduced there was a submissible jury question as to whether or not when defendant in effect represented that plaintiff's cow, B and B Mabelle Misch 1, was a registered cow, duly and properly registered with and under the rules of the American Hereford Association he made such representation with knowledge of the falsity of his statement

or recklessly made it as a positive assertation without knowledge of its truth, and that he intended V. G. Salmon to act in reliance thereon as he did by purchasing the cow. It has long been the rule that fraud may be implied from a representation, shown to have been false, whether made with knowledge of it being false, or recklessly made regardless of whether true or false. Dunham v. Tenth Street Garage & Sales Co., Mo.App., 94 S.W.2d 1096, 1099; Schroeder v. Zykan, Mo.App., 255 S.W.2d 105, 109; MacKinnon v. Weber, 230 Mo. App. 785, 75 S.W.2d 638, 641; 37 C.J.S. Fraud § 21, p. 255.

Upon our review of the record we have concluded that there is evidence sufficient to make this case one properly submissible to the jury on all the essential elements required to sustain plaintiff's tort action for fraud and deceit; namely, (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon. A failure to establish any one of these essential elements is fatal to a recovery. Powers v. Shore, Mo.Sup., 248 S.W.2d 1, 5; Dolan v. Rabenberg, 360 Mo. 858, 231 S.W.2d 150, 154; Hanson v. Acceptance Finance Co., Mo.App., 270 S.W.2d 143, 149.

Defendant charges the trial court with error in giving plaintiff's Instruction No. 5, which reads: "The Court instructs the jury if you find the issues for the plaintiff and against the defendant, it is then your duty to determine what actual damage, if any you find, the plaintiff has sustained, on account of having purchased the cow described in evidence from the defendant and to award him such sum as you find from the evidence will reasonably and fairly compensate him for any actual damage sustained, if you so find he was

damaged." Defendant urges that this instruction does not give the jury the correct basis for determining damages in this case, and confused and misled the jury.

It is well settled in this State that generally the proper measure of damages recoverable in a tort action for fraud and deceit whereby the fraud has induced a contract or transaction arising from commercial dealings with real or personal property, such as a sale or exchange, particularly where the fraud affects the value of the property dealt with, and where such property is retained by the one defrauded, is the difference between the actual value of the property at the time purchased and the value it would have had had the representations been true. Jeck v. O'Meara, 343 Mo. 559, 122 S.W.2d 897, 905; Singman v. Kotsrean Realty Co., Mo.App., 107 S.W.2d 196, 199; Menke v. Rovin, 352 Mo. 826, 180 S.W.2d 24, 27; Louis Steinbaum Real Estate Co. v. Maltz, Mo.Sup., 247 S.W.2d 652, 655, 31 A.L.R.2d 1052; Baker v. Atkins, Mo.App., 258 S.W.2d 16, 19; Dolan v. Rabenberg, 360 Mo. 858, 231 S.W. 2d 150.

Likewise it is established in this State that the rule that a defrauded purchaser's damages are to be measured by the difference between the purchased property's real value and its value if it had been as represented does not apply where the purchaser rescinds and returns the property received or where he received nothing of value, and in such case he may properly recover the amount he paid with interest from the date of payment, plus incidental losses and expenses suffered as a result of the seller's misrepresentations. Schroeder v. Zykan, Mo.App., 255 S.W.2d 105, 110; Walters v. Larson, Mo.App., 270 S.W.2d 112, 116.

Plaintiff elected to keep the cow, B and B Mabelle Misch 1. At the trial he introduced evidence to the effect he paid defendant $600 for the cow and that as a non-registered "grade" cow her value was

about $180, or $192. There was evidence that the cow had given birth to three calves after the sale and prior to the date of trial, and that the first-born of these calves was worth only $125, but would have been worth $250 if she were eligible to be registered. There was testimony that the other two calves were worth one-half as much unregistered as they would be worth registered or eligible for registration. With this testimony before it the jury allowed $1,200 actual damages. Obviously, the jury was confused and misled by the instruction concerning the measure of damages. It should have been instructed that the measure of damages was the difference at the time of the purchase between the actual value of the cow and the value it would have had if the representations as to it being a registered cow duly and properly registered under the rules and requirements of the American Hereford Association had been true. In arriving at that difference in value the jury could, of course, consider and allow for the fact the cow was then (at the time of purchase) with calf. It may well be that the cow was worth more with a calf to be born in the spring than if not then with calf. However, it is the difference in the value of plaintiff's cow if it had been as represented and its actual value that must be determined. With regard to the calves born after the sale of the cow, plaintiff is not entitled to include as an element of damage the difference in value of these calves if registered or eligible to be registered, and their value as calves not eligible for registration for these items are not within the scope of the applicable measure of damage rule.

 It is, of course, error to give a measure of damage instruction which fails to correctly guide the jury in determining the allowable damages and so confuses the jury as to cause it to return a verdict for actual damages far in excess of any amount supported by the record. Obviously, this is an error committed by the trial court against the appellant and materially affects

the merits of the action necessitating the reversal and remand of this cause for a new trial. Section 512.160, subd. 2 RSMo 1949, V.A.M.S.

We have carefully examined plaintiff's cited cases concerning the determination of damages and find nothing in them inconsistent with our expressed views. Some concern situations where the property sold to a defrauded purchaser was not retained, but was returned to the seller. None involved the fraudulent sale or transfer of a chattel that has been retained by the defrauded purchaser who sues for damages for the fraud perpetrated.

Defendant also claims that numerous other errors were committed in the trial of this case. However, having already determined that such error has been committed in the giving of plaintiff's Instruction No. 5 as will necessitate the remand of this cause for a new trial we need not consider them.

The judgment is reversed and the cause is remanded. It is so ordered.

All concur.

On Motion for Rehearing

PER CURIAM.

Both plaintiff and defendant by motion have requested a rehearing or in the alternative a transfer of this appeal to the supreme court. Defendant principally reargues his contention that the cause was not a submissible one, and plaintiff reargues his contention that his Instruction No. 5 was not a misdirection requiring a reversal. We do not find anything in either motion that would call for such action.

 Plaintiff suggests our opinion is subject to the interpretation that a defrauded party, who elects to keep the chattel sold to him, is limited to general damages only; namely, the difference between the value of the chattel if as represented and its actual value. We recognize the

broad general rule as stated in 37 C.J.S. Fraud § 141, pp. 465–66, that in cases of fraud or deceit the defendant is responsible for those results, injurious to plaintiff, which must be presumed to have been within his contemplation at the time of the commission of the fraud, and plaintiff may recover damages for any injury which is the direct and natural consequence of his acting on the faith of defendant's representations. A defrauded party is not limited to general damages, but may also recover special damages which have proximately resulted from the fraud. However, it remains the duty of the court to properly instruct the jury as to the measure of damages applicable under the issues and the evidence of the particular case. The fact that language used in an instruction may be found in the reasoning or conclusions of an appellate court, or of a law textbook, does not make it proper language for an instruction. Anderson V. Glascock, Mo. App., 271 S.W.2d 243; I Raymond, Missouri Instructions, Sec. 68, page 19 pocket part. The test of the correctness of an instruction is how the instruction will be naturally understood by the average men who compose our juries. Knapp v. Hanley, Mo.App., 153 Mo.App. 169, 132 S.W. 747. If the instruction is of such a nature as to give the jury a roving commission and the resultant amount of damages allowed by the jury is clearly contrary to the evidence, the verdict must be set aside. 37 C.J.S. Fraud § 152, p. 496.

This record does not contain any evidence of special damages, not speculative in nature, that occurred prior to plaintiff's discovery of the alleged fraud and which would be the proper basis of an instruction on the measure of damages including special damages. Thus, we remain convinced that in the instant case under its particular facts the proper measure of actual damages was the difference between the actual value of the cow and its value if it had been as represented. The jury should have been so instructed.

The motions are overruled.