Maggie YEAGER, Plaintiff-Respondent,

v.

Malcolm WITTELS and Wittels Investment
Co., Inc., Defendants-Appellants.

No. 35465.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Dec. 17, 1974.

Morton L. Schwartz, Clayton, for defendants-appellants.

Raymond D. Howard, St. Louis, for plaintiff-respondent.

SIMEONE, Presiding Judge.

This is an appeal by defendants-appellants, Malcolm Wittels and Wittels Investment Co., Inc., from a judgment of the circuit court of the City of St. Louis entered on April 19, 1973, after a jury verdict in favor of the plaintiff-respondent, Mrs. Maggie Yeager, for actual and punitive damages for fraudulent misrepresentation. We affirm.

Since one of the principal contentions on appeal is that the plaintiff, Mrs. Yeager, failed to make a submissible case, we will summarize the voluminous evidence in the light most favorable to the plaintiff and give her the benefit of all reasonable inferences to be drawn therefrom, disregarding the defendants' evidence unless it tends to support the plaintiff's case.

## I.

In June, 1954, James Yeager and his wife Maggie[1] purchased from the Wittels Investment Co., a real estate company, a residence at 1803 North Jefferson Avenue in the City of St. Louis for $7,700. The property was subject to two deeds of trust; the first for $3,750.00 and the second for $3,300 which by 1959 had been "paid down" to $2,962.25 and $1,817.42 respectively. From 1954 until 1959, the Yeagers made monthly payments to the defendants to reduce the amount of the deeds of trust. Mr. Wittels would often come to their residence to collect the payments.

Sometime in late 1958 the Yeagers received notice from the City of St. Louis advising them their property on Jefferson was to be condemned in order to open and widen Jefferson Avenue. Presumably during this interim the Yeagers searched for

---

1. Mrs. Yeager can neither read nor write. She can, however, sign her name and recognize her husband's signature. She did not complete the first grade. Her work experience was limited to cooking, housecleaning and work in cafeterias. Mr. Yeager did not finish school. He could read "about like" Mrs. Yeager. Before his death in 1971, after the institution of this suit, he had been a hod-carrier. She testified that she and her husband left "it up to Mr. Whittels" because they had "confidence and trusted him with everything."

another home. On September 23, 1959, they received a letter indicating that a hearing was set for October 22, 1959, to determine the worth of the property taken by reason of the street opening and widening. They were advised to bring a written appraisal of its value to the hearing. The Yeagers took the letter to Mr. Malcolm Wittels who, according to Mrs. Yeager, said that "he would take care of it." Mr. Wittels informed Mrs. Yeager that "he was going to prepare me a house at 4563 North Market, that he would sell me another house." Eventually and on October 22, 1959, Mr. and Mrs. Yeager entered into an "exchange contract" whereby Mr. and Mrs. Yeager agreed to exchange their property at 1803 North Jefferson for the residence located at 4563 North Market Street,[2] owned by a straw party in Mr. Wittel's office—Nona Schnell. The contract recited that the North Market property was subject to a deed of trust in the amount of $6,750.00,[3] and that a cash payment of $1,600.00 was to be paid to the Yeagers.

Prior to the exchange of properties, Mr. Wittels had told the Yeagers that the city was going to tear down their house on North Jefferson, and that he would see to it that she got another house. According to Mrs. Yeager's testimony, he also stated that she "wouldn't get any" money from the City, but "just exchange the house where I am at and get that on North Market, but I don't get no money."[4] After the exchange, Mr. Wittels informed Mrs. Yeager that she was entitled to some money from the City.

Although the exchange contract recited that $1,600.00 was to be paid to the Yeagers, plaintiff's evidence indicated that she received $700.00. On December 9, 1959, the Yeagers executed a general warranty deed on the Jefferson property to Nona Schnell, and on the same date a general warranty deed for the North Market street property was executed transferring the property to the Yeagers.

On December 14, 1959, the report of the City's condemnation showed that an award was made for the Jefferson property in the amount of $8,850.00. From this sum, the holder of the first deed of trust on the Jefferson property was paid $2,962.50, the indebtedness remaining on such trust deed. The remainder, approximately $5,887, was retained by Wittels Co., although Mr. Wittels indicated that $1,600.00 of the remainder had been turned over to the Yeagers. The $1,817.42 indebtedness remaining on the second deed of trust was paid to the holder of the second deed of trust.

Sometime in 1968 or 1969, a neighbor informed Mrs. Yeager that she was entitled to about $8,000 for her property on Jefferson.

The Yeagers, as stated, exchanged their Jefferson Street property for the North Market property. As testified to by Mr. Wittels, that property was originally purchased by Wittels Co. for five or six thousand dollars, and prior to the exchange he made certain improvements on it—furnace, roof, electric, plumbing, etc. He estimated the improvements at approximately $3,000

---

2. The contract contained a provision—"It is acknowledged by both the parties involved in this exchange contract that a suit is pending for the opening and widening of Jefferson Avenue and negotiations are in progress with the Office of Condemnation of the City of St. Louis."

3. Actually there was a first deed of trust in the amount of $4,500.00 and a second in the amount of $2,250.00.

4. "Mrs. Yeager, when you [sic] house on Jefferson was sold to Mr. Wittels . . .

did he, at that time, tell you that you would get any money from the city?
A: No.
Q: What did he say to you?
A: I wouldn't get any.
Q: What?
A: I don't get, just exchange the house where I am at and get that on North Market, but I don't get no money.
Q: When did you learn later that you should have gotten some money?
 * * * * *
Q: About four or five years ago?
A: Yes, Sir."

and the residence was evaluated at approximately $8,300 to $9,200. Mr. Wittels could not produce checks showing the cost of these improvements, so at trial defendant sought to introduce certain bookkeeping records, not kept by Wittels, but by an accounting firm, in order to show the costs of the improvements.

Mr. and Mrs. Yeager lived in the North Market property from 1959. She made mortgage payments from 1959 until May 2, 1970, paying some $75.00, sometimes reduced to $50.00 per month. She received various types of receipts for the payments, some for principal, some for interest, the impact of which she did not understand. Finally, she decided that she had paid off the mortgages on the North Market property, in the amount of about $12,000.00, and after May 2, 1970, discontinued payments.

Mrs. Yeager testified that she learned that she was entitled to the condemnation money some four or five years before trial when she was so informed by a friend—neighbor.

In July, 1970, Mr. and Mrs. Yeager filed an original petition. However, on October 12, 1971, an amended petition was filed in four counts.[5]

Count I sought a temporary restraining order and a permanent injunction to restrain defendants from "foreclosing and selling" the North Market property because she was not delinquent in her mortgage payments but has paid the full value of the property. Count II, upon which this action was tried, sought actual and punitive damages for the defendants' alleged fraudulent representation that she would be paid nothing for the Jefferson property. She further alleged that relying on this false representation, she exchanged the Jefferson Avenue property for $1,600.00 and had to pay $6,750.00 more. She sought $25,000 actual and $75,000 punitive damages. Count III sought an order requiring the defendants to give a complete accounting of all principal taxes and interest paid on the North Market property, but this count was subsequently dismissed on November 5, 1971. In Count IV, referred to as "Quiet Title", she prayed that a "judgment of fee simple [sic]" be awarded to her and that all mortgages be "vacated, abolished and held for naught." Only Count II was tried. A temporary restraining order was granted pursuant to Count I on November 25, 1970, and presumably is still in effect. Count IV has not been disposed of.[6]

Trial was held for several days during the week of April 16, 1973, before a jury and the Honorable William E. Buder. During the trial there were several incidents of which defendants complain.

(1) At trial Mrs. Yeager testified that she had received $700.00 cash in the exchange of the properties. However, in her amended verified petition she alleged that "her property" was exchanged for only $1,600.00 "though the City valued and made an award to defendants of $8,850.00 for it, and further, that plaintiff had to pay $6,750.00 more. . . ." While examining Mr. Wittels, counsel for Wittels attempted to read that paragraph of the amended petition to the jury. The court sustained an objection but indicated that counsel could read the same statement from the original, abandoned petition.

(2) During the course of examination, Mr. Wittels testified that about $3,000.00 worth of improvements had been made on the North Market property prior to the exchange. Since this was done some years ago, Mr. Wittels was unable to produce cancelled checks to prove the extent and nature of the improvements. Counsel for Mr. Wittels therefore sought to introduce the de-

---

5. Mr. Yeager, having died in March, 1971, was dropped as party.

6. The respondent's brief erroneously indicates that "no proceedings are currently pending on the remaining counts . . . of her amended petition . . . ."

fendant's cash disbursement bookkeeping records kept by an independent accounting firm. The trial court sustained an objection to the use of such records to prove the improvements made.

(3) During the course of Mrs. Yeager's direct examination, she testified that she had paid a total of $12,818.75 on the North Market property over the years since 1959. There were some 126 or 127 receipts and notes relating to such payments introduced in evidence. The court admitted the receipts in evidence, but sustained plaintiff's objection to passing the receipts to the jury. Numerous other exhibits, however, were passed to the jury. The court informed defendants' counsel that he could argue what the receipts and notes would show.

(4) At the close of the case, defendants offered Instruction A [7] but such instruction was refused.

At the close of the plaintiff's case defendants moved for a directed verdict on the grounds that (1) plaintiff failed to make a submissible case for fraud, (2) the action was barred by the statute of limitations because plaintiff was aware of any fraud in 1959 but did not file suit until 1970 · and (3) in effect there was a fair exchange of the property. The court overruled the motion.

At the close of all the evidence the motion was renewed and defendants in addition raised the issue that it was incumbent upon the plaintiff to tender the return of the North Market property as a condition to maintaining the suit for fraud. The motion was denied.

The cause was submitted on Count II and the jury returned a verdict for the plaintiff for $4,000.00 actual and $5,000.00 punitive damages.

## II.

On this appeal defendants contend the trial court erred in several respects. (1) It is contended that the court erred in overruling the motion for a directed verdict because Mrs. Yeager failed to prove all the necessary elements of misrepresentation, especially since the statements made were in the nature of a prediction, hence no submissible case was made. (2) The court erred in failing to direct a verdict for the defendants and refusing Instruction A because plaintiff did not tender a return of the North Market property as a condition to maintaining this action for misrepresentation since Counts I and IV are still pending and the plaintiff under the law is required to elect which remedy she would pursue.[8] (3) The court erred in not directing a verdict for the defendants be-

---

7. "If the jury believe from the evidence that the plaintiff and her late husband failed to offer or failed to tender the return of the consideration, to wit, the property in question on North Market as a condition to this maintaining an action in fraud [sic] then your verdict must be for the defendant."

At the close of the case defendants' counsel objected to the refusal to give this instruction because it is incumbent "upon the person suing for fraud to offer to return the consideration, that which they got and . . . it is their duty to offer to return property to defendant, on North Market, in order to get this consideration back . . . ." At one point counsel indicated that plaintiff was only required to tender the $2,400 equity she had in the Jefferson property which allegedly was applied to the exchanged property.

8. In effect what defendants contend is that since the plaintiff has sought damages for fraud on Count II she cannot at the same time maintain actions on Count I relating to the injunction to restrain foreclosure of the North Market property and on Count IV relating to the cancellation of any mortgages on the property. Such claims are inconsistent and hence plaintiff should be required to elect which of the counts she will pursue, and having sought damages on Count II, fraud, she cannot pursue her claims on Counts I and IV. Defendants contends that the court erred in denying the motion for a directed verdict because the plaintiff did not tender the North Market property "as a condition to their suit for fraud" but there is no such requirement to maintain such an action. A tender must be made when the plaintiff

cause Mrs. Yeager was aware of any alleged fraud at the time of the exchange contract, 1959, hence the statute of limitations bars the action since some eleven years (1959–1970) elapsed from the time of signing the exchange contract and the filing of suit, 1970. (4) The court erred in not allowing defendants' counsel (a) to read the amended petition to the jury, (b) to introduce the bookkeeping records to show the cost of improvements made on the North Market property, and (c) to pass the receipts and notes to the jury to refute plaintiff's contention that the North Market mortgages had been paid.

The respondent, Mrs. Yeager, on the other hand, contends that (1) she made a submissible case for misrepresentation, (2) no tender or return of the property was required, (3) the trial court properly (a) denied the attempt to read the amended petition, (b) refused to admit the bookkeeping records, and (c) exercised its discretion in refusing defendants' request to pass the receipts and notes to the jury.

The principal issues presented on this appeal as we view them are therefore (1) whether Mrs. Yeager established all the necessary elements necessary to maintain an action for fraud and misrepresentation, (2) whether plaintiff having elected to sue on Count II, fraud, can pursue her remedies under Counts I and IV since they are alleged to be inconsistent with the fraud count, (3) whether this action is barred by the statute of limitations and (4) whether the trial court committed trial errors.

### III.

 In determining whether the court erred in overruling the defendants' motion for directed verdict, we must view the evidence in the light most favorable to the plaintiff and give her the benefit of every inference reasonably deducible from such evidence and we must disregard the defendants' evidence except insofar as it might tend to aid the plaintiff's case. Salmon v. Brookshire, 301 S.W.2d 48, 53 (Mo.App.1957); Ackmann v. Keeney-Toelle Real Estate Co., 401 S.W.2d 483, 488 (Mo. banc 1966). Fraud, of course, can never be presumed. But it must be borne in mind that fraud is seldom susceptible of proof by direct evidence, but must almost invariably be shown by circumstances surrounding the transaction from which fraud may be reasonably inferred. Salmon v. Brookshire, supra, 301 S.W.2d at 53.

 Countless decisions have set forth the elements constituting misrepresentation. The essential elements are that (1) a representation was made of a material fact which was false and known to be false, or was recklessly made, (2) the statement was made with intent that it should be relied upon by the person and in the manner reasonably contemplated, (3) that the hearer was ignorant of the falsity of the statement, (4) that the hearer had a right to rely thereon and did in fact do so, and (5) that the plaintiff was induced thereby to act to his consequent and proximate injury.[9] Each of these elements must

___

elects to sue for legal rescission. The real thrust of defendants' contention is that the plaintiff having sued for fraud cannot continue to pursue the pending Counts I and IV because such remedies are inconsistent with Count II; defendants say she "wants her cake and to eat it too."

9. The elements are stated in various ways. See Teal v. Lee, 506 S.W.2d 492, 496 (Mo. App.1974) and Ackmann v. Keeney-Toelle Real Estate Co., 401 S.W.2d 483, 488 (Mo. banc 1966).
 The usual statement is: "The elements of a cause of action in fraud are: (1) a repre-

sentation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of the falsity or his ignorance of the truth; (5) the speaker's intent that his statement be acted upon; (6) the hearer's ignorance of the falsity of the statement; (7) his reliance on the truth of the statement; (8) the hearer's right to rely on the statement; and (9) the hearer's consequent and proximate injury. Ackmann v. Keeney-Toelle Real Estate Co., supra, 401 S.W.2d 483, 488 [4] (Mo. banc 1966)." Teal v. Lee, 506 S.W.2d at 496.

be proved. Lowther v. Hays, 225 S.W.2d 708, 713 (Mo.1950). While the burden rests upon him who asserts fraud, it is not necessary that it be shown by direct evidence. It may be established by facts and circumstances.

 We are convinced that under the facts and circumstances of this case the trial court did not err in denying the defendants' motion for a directed verdict. We conclude that the plaintiff made a submissible case. There was evidence from which the jury could have found each of the elements to be present. Here the relationship of the parties was such that the Yeagers reposed confidence in the defendants for a number of years. The Yeagers were limited in their education. Mrs. Yeager could not read or write. She believed Mr. Wittels was acting as her agent. When the Yeagers were informed about the condemnation of their Jefferson Avenue home, they brought the letter concerning the hearing to Mr. Wittels. Sometime in the course of the negotiations concerning the exchange of properties Mr. Wittels informed the Yeagers that the City was going to tear down the Jefferson property, that Mrs. Yeager was told she would not get any money from the City, but would just "exchange the house where I am at and get that on North Market, but I don't get no money." The evidence favorable to the plaintiff is sufficient to warrant a finding that Mrs. Yeager was ignorant of the falsity of the statement that Mrs. Yeager would not get any money from the City. Mrs. Yeager had a right to rely and did rely upon the representation which culminated in the exchange agreement exchanging the parcels of property. The award of $8,850 was eventually paid to Wittels Company, and after satisfying the first deed of trust on the Jefferson proper-

ty in the sum of $2,962.00, the defendants retained the balance of some $5,800.00.

Defendants contend that the representations were that Mr. Wittels' estimated value of the Jefferson property was $8,500.00, whereas in reality it was determined by the award to be valued at $8,850.00 and that therefore, this was not sufficient to constitute fraud. But the misrepresentation relied upon was that the Yeagers would receive "no money" from the City.

Viewing all of the evidence and the reasonable inferences deducible therefrom including the possible variances between the values of the two properties,[10] in the light most favorable to the plaintiff, we conclude that there was sufficient substantial evidence for the cause to be submitted to the jury and that the court did not err in overruling the motion for directed verdict at the close of the plaintiff's case and at the close of all the evidence.

## IV.

Defendants' second point while somewhat confusing is that the plaintiff having elected to sue for fraud cannot continue to assert Counts I and IV which are still pending. They contend that the law requires an election to be made between rescinding the contract or maintaining an action for fraud. Additionally, defendants make the contention that a tender or return of the North Market property is a condition to the claim for fraud.

This court recently explained the principles relating to election of remedies in a case involving fraud. Auffenberg v. Hafley, 457 S.W.2d 929 (Mo.App.1970). It was stated therein that "where a seller has been guilty of fraud, the purchaser, upon discovery of the fraud has an election of two remedies. Under one he may make a

10. The Jefferson Avenue property was valued at $8,850.00. Mr. Wittels testified that the North Market property was purchased for $4,000.00, or $5,000.00 or $6,000.00 and that there were some $3,000.00 worth of improve-ments made on it. Mrs. Yeager testified it was in a run-down condition. The jury has the right to cull and sift the evidence accepting or rejecting any part or all of the defendant's testimony.

timely rescission of the sale and recover whatever of value he has parted with. Under the other, he may keep the property and recover . . . the damages occasioned him by the fraud. The victim of a fraud may elect to pursue one of the remedies, but once having elected, he may not pursue or attempt to intermingle the remedies, for they are wholly inconsistent. . . ." 457 S.W.2d at 935.

As we view defendants' contention on this issue, they complain that the plaintiff should not be permitted to pursue both the fraud count and Counts I and IV since they are inconsistent in that plaintiff cannot recover damages for fraud and at the same time have the mortgages cancelled on the North Market property; that Counts I and IV are based on a theory of rescission while Count II is based on an affirmance of the exchange agreement.

■ We do not believe that Count II is inconsistent with Counts I and IV. Count II seeks to recover damages based on misrepresentation, while Counts I and IV are based on the theory that Mrs. Yeager has, since 1959, paid sufficient amounts of money to retire the mortgages on the North Market property. But in any event, respondent both in her brief and in the oral argument, conceded that the plaintiff has made an election among available remedies in pursuing Count II and that Counts I and IV are no longer viable and implied that if still viable, they would be dismissed. Therefore, because of the fact that the Counts are not inconsistent and because of these concessions by the respondent, this point is ruled against the defendants.

■ As to defendants' contention that the plaintiff must tender or return the North Market property as a condition to maintaining an action for fraud, there is no such requirement. Such is required in an action of rescission, but not fraud. Hence, the failure to give Instruction A was not error.

## V.

Next, defendants argue that the action is barred by the statute of limitations and therefore the court erred in not directing a verdict. They contend that Mrs. Yeager knew of any alleged fraud "right down the line, but there was nothing I could do about it." And since she and her husband did not file suit until 1970, the statute barred the action.

■ Section 516.120, RSMo.1969, V.A. M.S., describes those actions which must be filed "within five years." They include:

"An action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud."

Thus, there is in reality a fifteen-year maximum period to maintain an action. Berry v. Dagley, 484 S.W.2d 182, 184 (Mo.1972).

■ Mrs. Yeager testified that she did not know or realize that she was to receive some money for the condemnation until "about four or five years ago" from the time of trial, 1973, i. e., sometime in 1968 or 1969. While on deposition she did indicate that she knew she "was getting defrauded right down the line", yet, taking the evidence favorable to the plaintiff, we conclude that the trial court did not commit error in denying the defendants' motion on this issue.

The discovery was within the ten year grace period provided in the statute, and the suit was filed within five years from discovery.

■ Furthermore, the defendants did not offer an instruction on this affirmative defense. Failure to request such an instruction constitutes an abandonment of that affirmative defense even though the stat-

ute of limitations is affirmatively pleaded. National Bank of Commerce in St. Louis v. Laughlin, 305 Mo. 8, 264 S.W. 706, 717 (1924).; Pfefer v. Bachman, 386 S.W.2d 680, 684 (Mo.App.1964).

## VI.

Defendants next complain of certain alleged trial errors. (1) Defendants contend that the trial court erred in not permitting counsel to read plaintiff's amended petition to the jury. The amended petition alleged that the North Jefferson property was exchanged for only $1,600.00, which defendants contend shows that Mrs. Yeager received $1,600.00. She testified, however, that she only received $700.00 in cash. Therefore, presumably in order to impeach Mrs. Yeager, counsel desired to read that portion of the verified petition showing that she received $1,600.00.

■ Pleadings are addressed to the court, not to the jury, and therefore generally are inadmissible in evidence in the same case. Jimenez v. Broadway Motors, Inc., 445 S.W.2d 315, 317 (Mo.1969). An exception to this rule is that abandoned pleadings may be used when they contain admissions against the pleader's interest and may be employed to impeach. *Jimenez,* supra.

■ Near the close of the trial, counsel for defendant requested to read the amended petition. The court sustained an objection thereto, but informed counsel that he could read the original petition which contained the same allegations. The court ruled correctly.

Furthermore, during cross-examination of Mrs. Yeager, counsel did in fact impeach her by reading from the amended petition that paragraph relating to the payment of $1,600.00. Mrs. Yeager insisted, however, that she had received but $700.00.

(2) Defendants argue that the court erred in refusing to admit certain bookkeeping records which purportedly showed the costs for the remodeling work on the North Market property. Defendants were not able to produce the checks and receipts for the improvements for it was not their policy to retain such records for such a period of time—the improvements having been made more than ten years prior to trial. Defendants contend such records were admissible as secondary evidence.

■ But the record shows that such records were not kept by the defendants but by an accounting firm, and that the entries were not made at the time of the transactions. The trial court did not err in not admitting such records. They were neither admissible under the secondary evidence rule or the business records rule. Under the "best evidence" rule, the original document must be produced to prove the terms of a *writing* unless it is shown to be unavailable for reason other than the fault of the party seeking to prove the same. McCormick, Evidence, 560 (2d Ed., 1972). Defendants were attempting to prove the cost of the value of the improvements. The secondary evidence rule is inapplicable. Neither were the records admissible under the Business Records Act, § 490.680, RSMo., since as the court ruled, the records were not kept by the defendants but by an accounting firm and there was no showing that the records were kept in the regular course of business at or near the time of the transactions.

■ (3) Defendants' final contention is that the court erred in not allowing certain receipts and notes to be passed to the jury. The receipts and notes showed payments on the North Market property over the years. There were some 126 or 127 such notes and receipts.

■ Although exhibits which aid the jury in understanding the facts are generally admissible in evidence, the trial court has wide discretion to allow or refuse the passing of exhibits to the jury for examination. Cf. Eller v. Corwell, 238 S.W.2d 310, 313 (Mo.1951); Randall v. Steelman,

294 S.W.2d 588, 594 (Mo.App.1956); Zagarri v. Nichols, 429 S.W.2d 758, 761 (Mo.1968).

Many exhibits were passed to the jury, but the court refused permission to pass these 126 or 127 notes and receipts because the court said, "We could be here until Easter."

The trial court did not abuse its discretion in this regard.

We have thoroughly reviewed this complicated record and have read the briefs and the authorities cited by the appellants. The authorities relied upon are either distinguishable, or are not dispositive of the issues herein. We therefore conclude that no error was committed, and that the judgment should be affirmed.

The judgment is affirmed.

McMILLIAN and GUNN, JJ., concur.