William H. PANNELL, Respondent,

v.

MISSOURI INSURANCE GUARANTY
ASSOCIATION, Appellant.

No. KCD 29455.

Missouri Court of Appeals,
Western District.

Feb. 4, 1980.

Motion for Rehearing and/or Transfer
Denied March 3, 1980.

J. Michael Cronan, Jackson & Sherman, P. C., Kansas City, for appellant.

William C. Partin, Kansas City, for respondent.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

SOMERVILLE, Presiding Judge.

William H. Pannell (insured) sued Missouri Insurance Guaranty Association (association) for damages arising from theft of his automobile under the comprehensive coverage of a "Family Combination Automobile Policy" issued by Missouri General Insurance Company (company), the latter having become insolvent and placed in receivership. In addition to damages claimed under the policy, insured also sought damages and reasonable attorney's fees against the association for vexatious delay pursuant to Section 375.420, RSMo 1969.

Commencing on January 31, 1977, and concluding on February 3, 1977, the case was tried to a jury which, by its verdict, found for the insured and assessed damages in his favor in the amount of $3,850.00 under the policy plus $577.50 as prejudgment interest, and the further sums of $385.00 as a penalty and $4,000.00 as an attorney's fee pursuant to Section 375.420, supra. The court entered judgment in favor of the insured and against the association in the amount of $8,812.50, the aggregate sum assessed by the jury in its verdict. The association, after its motions for judgment notwithstanding the verdict and new trial were overruled, timely appealed.

Setting forth the points relied on by the association on appeal will be deferred until a factual background against which they must be measured has been laid. Until then, it is impossible to intelligibly relate to them because at this juncture they rest in an academic, abstract context.

On July 18, 1972, the insured purchased a 1971 Cadillac Coupe DeVille from B & G Motor Co. of K.C., Inc., Kansas City, Missouri. The purchase price was $5,400.00. Insured paid $1,000.00 down and financed the remainder through the seller, B & G Motor Co. of K.C., Inc., who shortly thereafter endorsed the note and assigned the security agreement concerning the unpaid balance to the Southside Bank of Kansas City (bank). At the time of the sale the automobile was titled in the name of B & G Motor Co. of K.C., Inc., and it assigned the certificate of title (Missouri) to the insured. The insured was living at 1327 Waverly, Kansas City, Kansas, at the time. Consequently, insured undertook to have the automobile registered in Kansas, and to obtain Kansas license plates for it. Insured was unsuccessful in doing so because he lacked the funds necessary for registering and licensing the automobile in Kansas. Not to be thwarted by a lack of funds, the insured borrowed some license plates from his brother which had been obtained for another automobile and placed them on the automobile purchased from B & G Motor Co. of K.C., Inc. The record fails to disclose

how long the borrowed license plates were used on the automobile.

At some undisclosed point of time the insured moved from Kansas to Missouri and on July 9, 1974, was living at 5323 Myrtle, Kansas City, Missouri. On July 9, 1974, at approximately 10:00 A.M., the insured went to visit a girl friend who was living in a two bedroom apartment at 3241 McGee, Kansas City, Missouri. The girl friend shared the two bedroom apartment with her brother, and at the time the brother shared his bedroom with a male friend named Michael White. The insured's girl friend was totally lacking in knowledge as to whether or not Michael White had a "criminal record" or had ever been in any kind of trouble.

When the insured arrived at the apartment he parked his automobile (the 1971 Cadillac Coupe DeVille) and locked it. Upon entering the apartment the insured and his girl friend drank some coffee in the kitchen of the apartment, at which time insured placed the keys to his automobile on a kitchen table. A short time later both went into the girl friend's bedroom where they fell asleep. The keys to the automobile were left on the kitchen table. When the two entered the bedroom the brother of the female acquaintance was away at work and Michael White was in the brother's bedroom with the door closed. Sometime between 12:00 noon and 1:00 P.M. insured's girl friend awakened, left the bedroom, and looked out a balcony window of the apartment in the direction of where the insured usually parked his automobile. Failing to see the insured's automobile, she awakened the insured and he confirmed that he had parked his automobile in the usual place. Upon receipt of this information she again looked out the balcony window and confirmed her suspicion that the insured's automobile was gone. She then went to her brother's bedroom to ask Michael White "about it" and discovered that he had left and taken all his clothes with him. A check of the kitchen table revealed that the keys to the insured's automobile were missing.

The police were immediately called and they arrived at the apartment around 3:00 P.M. and interviewed both the insured and his girl friend. In addition to certain basic information regarding the automobile and attendant circumstances surrounding its disappearance, the insured informed the investigating police officers that Michael White did not have permission to drive the 1971 Cadillac Coupe DeVille and that Michael White had apparently removed the keys from the kitchen table and taken the automobile. The officer in charge prepared a stolen vehicle report which the insured signed. Contained therein was an affirmation that insured was "aware of the fact that it was unlawful to make a false report to a Police Officer", that the information set forth was "true and correct", and that he (insured) would "assist in the prosecution of any person or persons responsible for the theft" of the "described motor vehicle". In addition, the insured orally reaffirmed to the investigating officers that he would assist in the prosecution of the person responsible for the theft of his automobile.

On the same day, to wit, July 9, 1974, insured contacted the company by phone and reported that his automobile had been stolen. In addition, on July 9, 1974, the insured reported the theft to his insurance agent, and the latter completed "a proof of claim form"[1] and mailed the same to the company (apparently on July 9, 1974) advising that insured's 1971 Cadillac Coupe DeVille had been stolen on July 9, 1974.

On or about July 10, 1974, insured's girl friend called Michael White's sister in Baton Rouge, Louisiana, and was informed that Michael White was in Burlington, Kansas. Other evidence revealed that Michael White was in custody of the police in Burlington, Kansas, for failing to pay for some gasoline obtained at a service station in Burlington, Kansas. Michael White's whereabouts was conveyed to the insured and he made a trip to Burlington, Kansas, in an effort to recover his stolen automobile. Through some unexplained mix-up Michael White and the stolen automobile

---

1. This "proof of claim" was never offered or introduced into evidence.

were released before the insured arrived in Burlington, Kansas.

On August 2, 1974, Miss Gray, an adjuster for the company, contacted the insured by phone and took a recorded statement from him concerning the theft loss. A transcript of the recorded statement was offered and admitted into evidence as an exhibit upon the stipulation of both parties that it was "a transcript of the telephone call" and "conversation" that ensued between the insured and Miss Gray on August 2, 1974. By way of a general summarization, the "transcript" disclosed the following: the insured was the owner of a 1971 Cadillac Coupe DeVille, tudor hardtop with a black top and a white bottom, which was stolen on July 9, 1974, while parked at his girl friend's apartment; details surrounding the circumstances of the theft and insured's attempt to recover the automobile in Burlington, Kansas, corresponded to those previously set forth in this opinion; the stolen automobile was equipped with air-conditioning, power steering, power brakes, automatic door locks and windows, AM–FM radio, built in tape, and General tires, purchased the previous year at a cost of approximately $80.00 per tire, with roughly 10,000 miles on them at the time the automobile was stolen; there was a dent in the front left fender of the automobile which the company had previously reimbursed the insured for in the amount of $322.00; and the odometer reading on the automobile at the time it was stolen was approximately 60,000 miles.

On August 13, 1974, a loan officer for the bank which had purchased the dealer paper on the 1971 Cadillac Coupe DeVille called the company and made inquiry of Miss Gray as to when the theft loss claim was going to be paid. She informed the bank's loan officer that the company needed more information and that the claim would then have to be presented to their claims committee to determine any loss. Miss Gray did not explicate as to what additional information was needed.

The insured had three or four additional conversations with Miss Gray, the dates of which are not revealed by the record, and during the course of the last conversation Miss Gray informed the insured that he didn't have a claim because his automobile had not been stolen.

On October 17, 1974, the FBI notified the bank's loan officer that the 1971 Cadillac Coupe DeVille had been located at Dealers Wrecker Service in Baton Rouge, Louisiana. This information was passed on to the insured who, in turn, passed the information on to Miss Gray, the company's adjuster. On November 5, 1974, the insured, at the direction of the bank's loan officer, sent a letter to Dealers Wrecker Service in Baton Rouge, Louisiana, advising that the 1971 Cadillac which they were holding belonged to him and had been stolen in Kansas City. Attached to the letter was a cashier's check in the amount of $215.00 to pay for towing and storage costs incurred against the automobile.

The company called the bank on November 8, 1974, and received the address of Dealers Wrecker Service in Baton Rouge, Louisiana, and advised that they were going to turn the matter over to an adjuster in the Baton Rouge, Louisiana, area. On November 11, 1974, Wilson Appraisal Service of Baton Rouge, Louisiana, inspected the 1971 Cadillac Coupe DeVille at Dealers Wrecker Service and prepared a report in the form of a repair estimate which was mailed to the company.

By a letter dated November 11, 1974, addressed to the bank, Dealers Wrecker Service advised that additional proof of ownership of the 1971 Cadillac Coupe DeVille was required before it would release the automobile. Enclosed with this letter was a copy of a report from the Louisiana State Patrol, Auto Theft Unit, advising that they could find no record of registration of vehicle # 683471Q120973 (the 1971 Cadillac Coupe DeVille's vehicle's identification number) in the States of Louisiana, Kansas and Missouri.

On November 13, 1974, the bank mailed certified copies of its security agreement and the Missouri Certificate of Title which B & G Motor Co. of K. C., Inc., had assigned

to the insured to Dealers Wrecker Service in Baton Rouge, Louisiana. On December 3, 1974, Dealers Wrecker Service responded by a letter advising that it had sold the 1971 Cadillac Coupe DeVille for $800.00, which under Louisiana law, it had a right to do.[2] Prior to that time the company had never requested the insured to go to Baton Rouge, Louisiana, to recover the 1971 Cadillac Coupe DeVille, nor did it ever offer to pay the insured's expense if he would do so. Considerable importance also attaches to the fact that the company made no suggestion or request that insured obtain a certificate of title to the 1971 Cadillac Coupe DeVille in his name.

The insured offered and had admitted into evidence certified copies of the following records of the United States District Court, Middle District of Louisiana: (1) an indictment charging that Michael White "did conceal a stolen motor vehicle, that is a 1971 Cadillac, VIN 683471Q120973, which was part of and constituted interstate commerce, knowing that the vehicle was stolen; all in violation of Title 18, Section 2313"; and (2) Michael White's plea of guilty to the charged offense, and the judgment and sentence entered and pronounced thereon.

The insured testified as to the condition of his 1971 Cadillac Coupe DeVille as of July 9, 1974, and that its "worth" as of that date was $4,000.00. The bank's loan officer testified that the automobile's "value" as of the date it was stolen was "$3,700.00 to $3,900.00."

The insured's attorney took the stand and testified as to the number of hours of time expended on the insured's behalf, as well as the nature of his services. Expert testimony as to the reasonable value of insured's attorney's services was also offered.

The insured's attorney further testified that he was retained by the insured in January of 1975, and that he contacted the company's claims department during the latter part of January, 1975, and was advised that the company didn't "feel the car was stolen and they weren't going to pay the claim". The insured's attorney filed suit on behalf of insured against the company on May 29, 1975.

After the company went into receivership, and more particularly on June 11, 1976, the insured filed a formal claim against the association for theft of his automobile. On December 9, 1976, by leave of court, the association was added as an additional party defendant. The company was eventually dropped as a party defendant and on January 31, 1977, the case proceeded to trial solely against the association.

A claims adjuster for another insurance company, who was on "loan" to the association to handle claims resulting from the insolvency and liquidation of the company, testified on behalf of the association that he first became acquainted with the insured's claim in early December of 1975. In the latter part of September or the early part of October of 1976 he received the company's file pertaining to the insured's claim. Among other things, it contained a transcript of the August 2, 1974, recorded telephone conversation which had ensued between the insured and Miss Gray, the company's adjuster, and certified copies of records of the Federal District Court, Middle District of Louisiana, supra, appertaining to Michael White. During October of 1976, the "loaned" adjuster exchanged views with the attorney representing the company and, at the attorney's suggestion, the latter was authorized to and did make the following settlement offer to the insured: $585.00 for damages to the automobile, the amount of the storage charges incurred with Dealer's Wrecker Service, and a reasonable amount representing expenses which would have been incurred by the insured had he gone to Louisiana to pick up the automobile. The "loaned" adjuster also verified testimony previously given by the insured's attorney that the aggregate amount of the offer represented payment of only 75% of the value he placed on the claim. The "loaned" adjuster further testified that he was not convinced that the automobile had in fact

---

2. No evidence was offered elaborating upon the "Louisiana law" which Dealers Wrecker Ser-

vice purportedly relied upon when it sold the 1971 Cadillac Coupe DeVille.

been stolen as it had been located and the insured had been afforded an opportunity to recover it. He said, generally speaking, that he did not require prosecutions and convictions as prerequisites to paying theft losses.

· Some of the issues raised by the association on appeal point up the advisability of making limited, but nevertheless specific, reference to certain allegations contained in various pleadings of the respective parties. In paragraph 6 of his "First Amended Petition on Insurance Contract" the insured alleged that [p]laintiff [the insured] has given due notice of said loss and said claim to [the company]". In its answer the association alleged that the insured's petition "fails to state a claim showing that . . . [insured] is entitled to any relief against . . [association]" and further alleged that ". . . [insured] has failed to comply with any of the provisions of any policy of insurance issued to . . . [insured]". No reply was filed by the insured. Insofar as the formal pleadings are concerned these are the only allegations pertaining to insured's compliance or lack of compliance with any of the "conditions" of the policy issued by the company.

The appropriate time has now arrived to set forth the points relied on by the association on appeal. The association, drawing upon the status of the evidence and pleadings heretofore outlined, raises five multiple-part points on appeal. They project a farrago of procedural, substantive, and evidential issues in a highly convoluted manner by virtue of repetitiously asserting them in all three contexts. In order to present a more discernible view of the issues raised on appeal, and to facilitate a better grasp of them for dispositional purposes, this court, particularly after seining the argument portion of the association's brief, has taken the liberty of rewording and recasting them, without elaboration, into nine separate points, to wit: (1) error on the part of the trial court "in overruling" the association's "motion for judgment notwithstanding the verdict" because insured's petition failed to state a claim upon which relief could be granted in that insured failed to plead, specifically or generally, that he had complied with policy Condition 8(b) (proof of loss), or to plead any facts relieving him of compliance therewith; (2) error on the part of the trial court "in overruling" the association's "motion for judgment notwithstanding the verdict" as "all the evidence showed as a matter of law" that insured had not complied with policy Condition 8(b) (proof of loss) nor policy Condition 8(a) (duty to protect); (3) error on the part of the trial court in submitting the issue of "vexatious refusal to pay" to the jury because the association was not subject to the provisions of Section 375.-420, RSMo 1969;[3] (4) error on the part of the trial court in giving insured's principal verdict directing instruction (Instruction No. 3) because it failed to require the jury to find that insured had complied with policy Condition 8(a) (duty to protect); (5) error on the part of the trial court in refusing to give association's requested Instruction No. D defining "theft or larceny" because *the same are technical terms;* (6) error on the part of the trial court in giving insured's requested measure of damages instruction (Instruction No. 5) because said instruction deviated from MAI 4.02 ("Measure of Damages—Property Only") in that it cast the measure of damages in terms of "actual cash value" rather than in terms of "fair market value"; (7) error on the part of the trial court in giving insured's requested measure of damages instruction (Instruction No. 5) in that it erroneously permitted the jury to award prejudgment interest from the date of the loss on any amount awarded to insured under the theft coverage of the policy; (8) error on the part of the trial court in refusing to grant association's request to pass and circulate to the

---

3. The issue of "vexatious refusal to pay" was submitted to the jury per the provisions of Section 375.420, RSMo 1969, rather than under the provisions of said statute as amended in 1975. See Section 375.420, RSMo Supp. 1975.

So far as here pertinent the 1975 amendment merely enhanced the penalty for damages and does not change the posture of the issue presented.

jury during the course of the trial association's Exhibits 9, 10, 11, 12 and 13 and insured's Exhibit 26, all of which had previously been identified and admitted into evidence; and (9) error on the part of the trial court in refusing to admit association's Exhibit 5, same showing B & G Motor Co. of K.C., Inc.'s, predecessors in title re the 1971 Cadillac Coupe DeVille and that a new certificate of title had never been issued in the name of the insured because said exhibit "was relevant to the issue of . . . [insured's] failure to protect the Cadillac from additional loss".

■ Relying upon *Harding v. State Farm Mutual Automobile Ins. Co.*, 448 S.W.2d 5 (Mo. banc 1969), the association contends by way of Point (1) that insured's petition failed to state a claim upon which relief could be granted in that it failed to specifically or generally aver that insured had performed or complied with policy Condition 8(b) (proof of loss), or to aver any facts showing waiver thereof or estoppel, all of which rendered insured's petition jurisdictionally defective[4] and constituted a matter which under Rule 55.27(g)(2) could be reached "in any pleading permitted or ordered under Rule 55.01, or by motion for judgment on the pleadings, or at the trial on the merits, or on appeal."

The principal holding in *Harding v. State Farm Mutual Automobile Ins. Co., supra*, is, in a sense, capsulated at 448 S.W.2d at 7: "As declared in *Streib v. Local Lodge No. 27 of I. B. of Boiler Makers, Etc.*, Mo.App., 40 S.W.2d 519, 521, 'The doctrine seems to be settled in this state that performance of a condition precedent must be alleged or an excuse given for its nonperformance to make the pleading a good one.' Mo.Dig., Insurance, ■ Pleading, ■ ■ 71 C.J.S. Pleading § 80, p. 193; 44 Am.Jur.2d, Sec. 1939, p. 877. Specific application of this rule [duty to allege performance of conditions pleaded in a suit on a contract] to an action based on a contract of insurance was made in *Propst v. Capital*

*Mut. Ass'n*, 233 Mo.App. 612, 124 S.W.2d 515, 520, wherein the court said, 'The petition does not allege that plaintiff furnished proofs of loss, or any fact showing waiver thereof or estoppel, nor, does it allege, generally, that plaintiff has performed all of the conditions precedent. It is, therefore, defective.'" In *Harding*, the court relieved the defendant-insurer from a default judgment by permitting it to attack a jurisdictionally defective petition for the first time on appeal. Virtually total reliance by the association on *Harding* is seriously flawed as *Propst v. Capital Mut. Ass'n*, 124 S.W.2d 515 (Mo.App.1939), cited with approval by the *Harding* court, in affirming a jury verdict in favor of a plaintiff-insured against a defendant-insurer in a suit on an accident policy, went on to hold at 124 S.W.2d at 520–21 as follows: "The petition does not allege that plaintiff furnished proofs of loss, or any fact showing waiver thereof or estoppel, nor, does it allege, generally, that plaintiff has performed all of the conditions precedent. It is, therefore, defective. However, the answer to each count of the petition pleads that defendant 'denies that plaintiff has complied with the terms, conditions and provisions of said certificate hereinabove set out and the by-laws of the defendant association, and denies that plaintiff has made any demand upon the defendant in accordance with the provisions, terms and conditions of said by-laws and the certificate or policy'. The reply, among other things, denies, generally, the allegations of the answer. . . . . Under the doctrine of aider the answer must be considered as having cured the omission in the petition of the required allegations in controversy. 'A petition, declaration, or complaint which fails to allege a material fact, or defectively alleges it, and thereby fails to tender an issue as to such fact, may be aided, and the defect or omission may be cured, by a plea or answer which tenders an issue as to the fact by specifically denying it, averring its nonexistence or alleging the opposite or converse thereof.' 49 C.J. p.

866. . . . As to a situation of this kind it is well stated by the St. Louis Court of Appeals in *Beckmann v. Phoenix Ins. Co.,* 49 Mo.App. 604, 607: 'Performance of a condition precedent must be alleged, or excuse given for the non-performance of it, or else the petition will be bad on demurrer. *Basye v. Ambrose,* 32 Mo. 484. . . . Here, however, defendant's answer, by way of defense, sets up the *non-performance of conditions precedent on the part of the plaintiff, and the . plaintiff took issue by reply.'* (Italics ours.)"

In the instant case the averment in association's answer that "[p]laintiff [insured] has failed to comply with any of the provisions of any policy of insurance issued to plaintiff [insured]", via the doctrine of aider, generally injected the issue of insured's performance vel non of the policy conditions for jurisdictional purposes. The fact that insured filed no reply to the association's answer is of no moment as he was not required to do so under Rule 55.01 and the association's averment of non-compliance was deemed denied by operation of Rule 55.09. *Valleroy v. Southern Railway Company,* 403 S.W.2d 553, 556 (Mo.1966), in an analogous situation involving application of Illinois substantive law and Missouri procedural law, reached the same result under the predecessors of present Rules 55.01 and 55.09. The association's claim that insured's petition was fatally defective jurisdictionally is not well taken.

■ The association contends under Point (2) that the trial court erred in overruling its motion for judgment notwithstanding the verdict as "all the evidence showed as a matter of law" that insured had not complied with policy Condition 8(b) (proof of loss) nor policy Condition 8(a) (duty to protect). The insured, notwithstanding the frail nature of his petition, argues that compliance vel non with the respective policy conditions was not in issue as the association failed to deny performance thereof "specifically and with particularity" as required under Rule 55.16. Recalling that the insured's infirm pleading was saved by the doctrine of aider, para-

doxically, the association's allegedly infirm pleading is saved by Rule 55.33(b) which sanctions the amendment of pleadings by the evidence. A plethora of evidence was introduced by both the insured and the association without objection during the course of the trial germane to the issues of compliance vel non with policy Conditions 8(b) (proof of loss) and 8(a) (duty to protect), as well as evidence which would excuse the insured from strict compliance. Consequently, both aspects of the association's second point will be substantively addressed.

The association asserts, albeit correctly, that the record conclusively demonstrates that the insured failed to submit a formal proof of loss concerning the theft of his automobile in compliance with policy Condition 8(b) (proof of loss). The duty imposed upon an insured to plead compliance with a condition precedent of a policy of insurance in order to state a cause of action against an insurer under a policy as enunciated in *Harding v. State Farm Mutual Automobile Ins. Co., supra,* is somewhat difficult to reconcile with an extant line of cases which hold that non-compliance with certain conditions precedent contained in a policy of insurance does not defeat recovery under a policy unless the insurer is prejudiced thereby and, if so, the issue of prejudice takes on characteristics of an affirmative defense which the insurer must shoulder the burden of proving. With respect to an insured's undisputed failure to submit a sworn proof of loss under a fire and windstorm policy of insurance, the St. Louis Court of Appeals in *Schultz v. Queen Insurance Company,* 399 S.W.2d 230, 235 (Mo.App.1966), after tracing a long line of Missouri cases holding that failure to give notice of a claim under an insurance policy would not defeat an insured's right of recovery absent a showing by the insurer that it was .prejudiced, affirmed a judgment in a jury tried. case in favor of the insured, and in doing so held: "Defendants first complain that this instruction [Instruction No. 1] failed to require the jury to find that plaintiffs filed a proof of loss. We have already ruled that this would be incumbent on plaintiffs only

if defendants had proved they were prejudiced by plaintiffs' failure."

*Northwestern Mut. Ins. Co. v. Independence Mut. I. Co.*, 319 S.W.2d 898 (Mo.App. 1959), a case antedating *Schultz* which was also decided by the St. Louis Court of Appeals, had injected considerable uncertainty into the pervasive issue of compliance or not by an insured with conditions precedent contained in an insurance policy by various statements to the effect that "compliance with such condition [condition precedent] is necessary, and non-compliance entitles the insurer to deny liability under the policy", 319 S.W.2d at 902, and "[i]n assessing insured's conduct it is not necessary for appellant [insurer] to show that insured's conduct resulted in prejudice to the insurer, in view of the fact that condition 2 constituted a condition precedent.", 319 S.W.2d at 905. However, any uncertainty injected by *Northwestern Mut. Ins. Co. v. Independence Mut. I. Co., supra*, was dispelled by *Greer v. Zurich Insurance Company*, 441 S.W.2d 15, 32 (Mo.1969), a case postdating *Schultz*, which held that "statements" such as those heretofore alluded to in this opinion from *Northwestern Mut. Ins. Co. v. Independence Mut. I. Co., supra*, "should no longer be followed". *Greer v. Zurich Insurance Company, supra*, a court tried case, involved a third party's right of recovery under the liability coverage of three automobile insurance policies. So far as here pertinent, the judgment entered by the trial court exonerated one of the insurers from liability under its policy on the ground that said insurer had proven that it was prejudiced by the named insured's failure to comply with two conditions precedent (notice of accident and notice of suit) in its policy. Upon an appeal taken by the third party, the judgment in favor of the concerned insurer was affirmed. The opinion, as garnered from all four corners, holds that although non-compliance by the named insured with the conditions precedent, standing alone, did not exonerate the insurer from liability, proof by the insurer that it was prejudiced by the named insured's non-compliance with the conditions precedent did exonerate the insurer from liability.

■ *Schultz v. Queen Insurance Company, supra*, and *Greer v. Zurich Insurance Company, supra*, make it apparent that the dispositional basis for the first aspect of Point (2) may be reduced to a determination of whether there was any evidence that the association was prejudiced by insured's failure to file a formal proof of loss as required by Condition 8(b) of the policy. Reliance upon this narrow basis is eminently justified as both *Schultz* and *Greer* support the proposition that insured's failure to file a formal proof of loss as required by Condition 8(b) of the policy would not exonerate the association from liability absent proof by it that it was prejudiced by insured's failure to do so. After thoroughly probing the record, this court has failed to find even a scintilla of evidence which directly or circumstantially suggests, much less proves, that the association was prejudiced by the insured's failure to file a formal proof of loss. Conjunctively, the association has never suggested nor argued, either below or on appeal, that it was in any way prejudiced by the insured's failure to file a formal proof of loss. Under the authority of *Schultz v. Queen Insurance Company, supra*, and *Greer v. Zurich Insurance Company, supra*, the first aspect of the association's second point on appeal is found to be wholly without merit.[5]

5. This result is consistent with MAI 32.24 adopted and approved by the Supreme Court on May 23, 1977, effective January 1, 1978. Although MAI 32.24 postdated the trial of the instant case it was obviously presaged by *Greer v. Zurich Insurance Company*, 441 S.W.2d 15 (Mo.1969). MAI 32.24, including the "Committee's Comment" appended thereto, reads as follows:

"32.24 (1977 New) Affirmative Defense—Insurance Policy Defense.

Your verdict must be for defendant insurance company if you believe:

First, plaintiff (*describe violated policy condition, e. g., failed to submit a proof of loss to defendant within the time prescribed by the policy*), and

Second, defendant insurance company was thereby prejudiced.

Committee's Comment (1977 new)

This instruction should not be given unless there is evidence of a material breach of a

The second and final aspect of the association's second point on appeal, that the trial court erred in overruling its motion for judgment notwithstanding the verdict as "all the evidence showed as a matter of law" that insured has not complied with policy Condition 8(a) (duty to protect) is now in line for resolution. As will later be seen, insured's failure to file a formal proof of loss as required by policy Condition 8(b), like "Marley's ghost", returns to haunt the final aspect of Point (2). In a very real sense, substantial compliance with policy Condition 8(b) (proof of loss), an essential ingredient for deciding the final aspect of Point (2), could also have served as an alternative ground for resolving the first aspect of Point (2).

Condition 8 of the policy of insurance in question is captioned "Insured's Duties in Event of Loss—Part III". "Coverage G—Theft" is included under Part III of said policy. More particularly, Condition 8(a) of said policy reads as follows: "In the event of loss the insured shall: (a) protect the automobile, whether or not the loss is covered by this policy, and any further loss due to the insured's failure to protect shall not be recoverable under this policy; reasonable expenses incurred in affording such protection shall be deemed incurred at the company's request;". The association appears to contend that the insured violated Condition 8(a) of the policy by not pursuing, protecting and retrieving his automobile after it was located in Baton Rouge, Louisiana. Nevertheless, the association has failed to cite any authority to support its position that a policy condition such as 8(a) (duty to protect) is applicable to theft coverage afforded under a policy of automobile insurance. Although reasons for its applicability to other coverages extended under an automobile insurance policy for "Physical Damage" are conceivable by reason of an insured's possession of a damaged automobile, it is difficult to conceive that it was intended to apply to theft coverage because of the inescapable fact that an insured is no longer in possession of the automobile in the sense just mentioned. However, assuming arguendo that policy Condition 8(a) (duty to protect) is applicable to a theft loss, limited or otherwise, this court will proceed to address the final aspect of Point (2) in the tenor in which it is raised by the association.

As subsequently demonstrated, Condition 6 applicable to "Part III—Physical Damage" (Coverage G—Theft) of the policy, which reads in part as follows, bears consideration: "No action shall lie against the company . . . under Part III, until thirty days after proof of loss is filed and the amount of loss is determined as provided in this policy." It should be mentioned that neither the company nor the association contended, nor did the association attempt to prove, that the insured failed to submit to any procedure provided in the policy for determining the amount of the loss.

Although neither party has cited, and this court's independent research has failed to locate, any Missouri cases so holding, this court on its own initiative has "ferreted" out several hoary cases from other jurisdictions which hold that the insured-owner of a stolen automobile need not pursue and attempt to retrieve it after right of payment from the insurer accrues. See: *O'Connor v. Maryland Motorcar Ins. Co.,* 287 Ill. 204, 122 N.E. 489 (1919); *Cancilla v. Fireman's Fund Ins. Co.,* 287 Pa. 223, 120 A. 824 (1923); and *Sawyer v. National Fire Ins. Co.,* 43 S.D. 228, 220 N.W. 503 (1928). The matter is aptly put in *Sawyer v. Na-*

policy condition. *Greer v. Zurich Insurance Co.,* 441 S.W.2d 15 (Mo.1969)."
The practical thrust of MAI 32.24 appears to be that non-compliance with a condition precedent contained in a policy of insurance is an affirmative defense and to impress upon an insurer the dual burden of *pleading* and *proving* (1) non-compliance and (2) that it was prejudiced thereby. This seems to be a valid conclusion in light of Rule 55.08 which requires a party pleading to a preceding pleading to affirmatively plead an affirmative defense. As the "Committee's Comment" makes no reference to *Harding v. State Farm Mutual Automobile Ins. Co.,* 448 S.W.2d 5 (Mo. banc 1969), this court refrains from indulging in speculation as to the effect of MAI 32.24, if any, on the procedural ruling upon which *Harding* pivoted.

*tional Fire Ins. Co.,* 220 N.W. at 506: "As to the alleged violation of the terms of the policy because plaintiff refused to attempt to recover the car from Deronda, Wis.: The 60 days after waiver of furnishing of proof had expired long before the information from Deronda reached the plaintiff. In transmitting this information to the defendant, he did all that was incumbent upon him at that time. If owners of motor vehicles are given to understand that it is their duty to pursue stolen cars for an indefinite period after the loss, it seems probable that there would be little such insurance written. The courts that have considered this question hold that the assured is not required to pursue the stolen property after the date when the policy provides that the payment is due. *O'Connor v. Md. Motor Car Ins. Co.,* 287 Ill. 204, 122 N.E. 489, 3 A.L.R. 787; *Cancilla v. Fireman's Fund Ins. Co.,* 277 Pa. 223, 120 A. 824; Joyce on Insurance (8th Ed.) §§ 2898, 2901, and 2770." An analysis of Condition 6 of the policy (in terms of its applicability to "Coverage G—Theft") against the record in the instant case supports the conclusion that the insured's right to sue under the policy would have accrued thirty days after a proof of loss was filed. Plain logic supports the conclusion that in the context at hand the right to sue and the right of payment from the company are pragmatically synonymous and accrued simultaneously. Otherwise, an insured's duty to pursue and protect a stolen automobile under a condition like or similar to Condition 8(a) of the instant policy would extend indefinitely.

■■ Unfortunately, at this point there is no way to avoid returning to the vexing question of the insured's failure to have filed a formal proof of loss as submission of a proof of loss triggered computation of the time when the insured's right to sue accrued, and, concomitantly, when his purported duty to pursue and protect the stolen automobile ceased.

6. Condition 8(b) of the policy issued to the insured in this case, so far as here pertinent, reads as follows: "file with the company, within 91 days after loss, his sworn proof of loss in such form and including such information as the company may reasonably require . . .."

Although no Missouri cases have been cited, or found, broaching or advancing the doctrine or principle of substantial compliance with a condition precedent contained in a policy of insurance requiring the filing or submission of a formal proof of loss,[6] it is far from a novel doctrine or principle in other jurisdictions. See: *Truck Insurance Exchange v. Hale,* 95 Ariz. 76, 386 P.2d 846 (banc 1963); *Maryland Casualty Company v. Clements,* 15 Ariz.App. 216, 487 P.2d 437 (1971); *Austin Building Co. v. National Union Fire Ins. Co.,* 403 S.W.2d 499 (Tex.Civ. App.1966); and *Sutton v. Fire Insurance Exchange,* 265 Or. 322, 509 P.2d 418, 420 (1973). More particularly, see *Aetna Casualty & Surety Co. v. Valley National Bank,* 15 Ariz.App. 13, 485 P.2d 837, 840 (1971), where the doctrine of substantial compliance was espoused as follows: "Normally, in the absence of a specific requirement in a policy that a particular form or type of proof of loss be utilized in reporting to the company, it has generally been held that any method which serves to advise the insurer of the loss so as to enable it to adequately consider its rights and liabilities shall suffice. *Overland-Arizona Co. v. California Insurance Co.,* 35 Ariz. 115, 274 P. 784 (1929); *Aetna Life Ins. Co. v. Duncan,* 165 Ark. 395, 264 S.W. 835 (1924); *O'Brien v. North River Ins. Co.,* 212 F. 102 (4th Cir., 1914). Moreover, the Arizona Supreme Court has held that substantial compliance with even a detailed proof of loss requirement in a policy is sufficient. *Truck Insurance Exchange v. Hale's Towing Service,* 95 Ariz. 76, 386 P.2d 846 (1963). In this case it appears that the information supplied by the plaintiff to the defendant was sufficient to allow a 'complete investigation and evaluation' by the defendant insurance company and we therefore hold there was a substantial compliance with the provision of the proof of loss requirement of defendant's

The record is devoid of evidence that the company ever conveyed to the insured any requirement as to the form or content of the proof of loss the association presently claims the insured was remiss in not submitting.

policy and plaintiff is not precluded from maintaining this action because of a failure to file a formal proof of loss form."

The purpose which proofs of loss are designed to serve has previously been the subject of judicial discussion in this state. The court in *Hughes v. Patriotic Ins. Co.*, 193 S.W.2d 958, 960 (Mo.App.1946), had this to say: "The purpose of requiring proof of loss is to inform the insurance company of the essential facts in the case which are necessary for the determination of its liability." The court in *Schell v. Metropolitan Life Ins. Co.*, 3 S.W.2d 269, 271 (Mo.App. 1928), had this to say: "Certain it is that such proof is not intended as a mere device to enable the insurer to evade its just obligations under the policy, but it is intended merely as a means of furnishing the insurer with the facts from which it may determine its liability." These proclamations are compatible with the doctrine of substantial compliance. After refocusing on the transcript of the recorded telephone conversation that ensued between the insured and Miss Gray, the company adjuster, on August 2, 1974, this court, without compunction, concludes that the facts thereby obtained by the company afforded a sufficient and adequate basis for it to determine its liability under the theft coverage. Taking cognizance of the fact that the transcript of the recorded telephone conversation was offered and admitted into evidence upon the stipulation of both parties that it was "a transcript of the telephone call" and "conversation" that occured between the insured and Miss Gray on August 2, 1974, this court holds that insured substantially complied with policy Condition 8(b) (proof of loss) on August 2, 1974, and that his right to bring suit under policy Condition 6 (as applicable to Part III—Coverage G—Theft) accrued on September 2, 1974. Knowledge that the stolen automobile had been located in Baton Rouge, Louisiana, was first obtained on October 17, 1974. As the insured's right to bring suit accrued on

September 2, 1974, his duty to pursue, protect and retrieve the stolen automobile in Baton Rouge, Louisiana, assuming arguendo that policy Condition 8(a) (duty to protect) was otherwise applicable, terminated on September 2, 1974, under the reasoning and emanating principles advanced in cases such as *O'Connor v. Maryland Motorcar Ins. Co.*, supra, *Cancilla v. Fireman's Fund Ins. Co.*, supra, and *Sawyer v. National Fire Ins. Co.*, supra, approved and adopted by this court. The final aspect of Point (2) fails to afford any ground for relief to the association.

■ The association complains by way of Point (3) that the trial court erred in submitting the issue of "vexatious refusal to pay" to the jury because it was not subject to the provisions of Section 375.420, RSMo 1969.[7] It should be emphasized that insured's claim of "vexatious refusal to pay" was predicated and submitted to the jury solely upon the association's conduct after it entered the picture and not on any conduct of the company. The answer to this issue is to be found both in Section 375.420, *supra*, and certain highly relevant statutory provisions applicable to the Missouri Insurance Guaranty Association. Section 375.420, *supra*, reads as follows: "In any action against any *insurance company* to recover the amount of any loss under a policy of fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance, if it appear from the evidence that such company has vexatiously refused to pay such loss, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed ten percent on the amount of the loss and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict." (Emphasis added.) Collaterally, "insurance company" as used in Section 375.420, *supra*, is defined in Section 375.012(4), RSMo 1969,

---

7. Although Section 375.420, RSMo 1969, was amended in 1975 (See Section 375.420, RSMo Supp.1975) in certain respects, for instance the amount of recoverable damages was increased,

the insured's verdict directing instruction submitting the issue of "vexatious refusal to pay" accorded damagewise with Section 375.420 as it existed prior to the 1975 amendment.

as follows: " '*Insurance company*', any corporation, partnership, unincorporated association, mutual or individual transacting or doing the *business* of insurance, but not including an insurance agent, broker, insurance agency, reciprocal or interinsurance exchange, unless *expressly so provided*, trusteed pension plans and profit sharing plans qualified under the United States Internal Revenue Code as now or hereafter amended; *provided, however, the specific exclusions listed herein shall not be construed as all inclusive . . .*" (Emphasis added.) The Missouri Insurance Guaranty Association is a "nonprofit unincorporated legal entity", and is purely a creature of statute. Section 375.785, RSMo 1978. Broadly speaking it was created to protect certain insureds from the effects of insolvency of certain types of insurance companies. Section 375.785, *supra*. Although the "business of insurance" is not statutorily defined in Section 375.012(4), *supra*, definement of the qualifying word "business" is aided by *Suburbia Gardens Nursery, Inc. v. County of St. Louis*, 377 S.W.2d 266, 270–71 (Mo. banc 1964), wherein the term "business" was generally defined as a " 'commercial or mercantile activity customarily engaged in as a means of livelihood and typically involving some independence of judgment and power of decision.'" Also deemed apposite is *Freese v. St. Paul Mercury Indemnity Co.*, 252 S.W.2d 653, 655 (Mo.App.1952), which defined "business" in conjunction with the term "business operation" contained in a policy of insurance as a "commercial or industrial undertaking usually entered into for financial gain." The association is a "nonprofit unincorporated legal entity", Section 375.785.1, *supra*, and its responsibility for claims resulting from the insolvency of certain insurance companies is mandated by statute rather than by choice and no financial "gain" inures to it. Hence, it cannot be said to be engaged in a "commercial or industrial" undertaking as those terms are commonly understood. In summation, the statutory nature and genesis of the association augur against the conclusion that the association is engaged in transacting or doing the "business" of insurance.

Even if the statutorily mandated duties and obligations of the association could be said to bear some semblance to "transacting or doing the business of insurance", it is crystal clear that the statute (Section 375.785, RSMo 1978) which sired the association by the same token insulated it from the application of Section 375.420 (damages and attorney's fees for "vexatious" refusal to pay), *supra*, insofar as its own conduct was concerned. It is clear that the limits of the association's liability are tightly drawn by the legislation which created it. Relevant statutory provisions contained in Section 375.785, *supra*, from which this conclusion is drawn, are unambiguous and their application rather than their construction is all that is involved. The association is "deemed" an "insurer" only "to the extent of its obligations on . . . covered claims." Subsection 4(1)(b) of Section 375.785, *supra*. "Covered claim" is defined as "an unpaid claim . . . which arises out of *and is within the coverage of an insurance policy* to which this section applies issued by a member insurer, if such insurer becomes an insolvent insurer . . .". Subsection 3(2) of Section 375.785, *supra*. (Emphasis added.) Subsection 4(1)(a) of Section 375.785, *supra*, provides in part that "[i]n no event shall the association be obligated to a policyholder or claimant in an amount in excess of the face amount[8] of the policy from which the claim arises." Perhaps motivated by excessive caution, the legislature saw fit to place beyond the realm of doubt that the limits of the association's liability were even more tightly drawn with respect to the precise issue tendered by Point (3), i.e., that the association was not subject to Section 375.420, *supra*, for its own conduct in the handling of claims, by expressly providing that "[t]here shall be no liability on the part of and no

---

8. The face amount of the company's policy with respect to "Coverage G—Theft" was $5,000.00.

cause of action of any nature shall arise against . . . the association . . . for any action taken by . . . [it] in the performance of . . . [its] powers and duties under this section." Subsection 14 of Section 375.785, *supra.* Accordingly, the association's third point on appeal is well taken.

Point (4) is next in order, i.e., that the trial court erred in giving insured's principal verdict directing instruction, Instruction No. 3, because it failed to require the jury to find that insured had complied with policy Condition 8(a) (duty to protect). The quintessence of this point is the association's contention that insured failed to pursue, protect and retrieve the stolen automobile after it was located in Baton Rouge, Louisiana. The same was true of the second and final aspect of association's Point (2) on appeal—that "all the evidence showed as a matter of law" that insured had not complied with policy Condition 8(a) (duty to protect)—which was ruled adversely to the association. Under the principles there applied to the facts, the insured's duty to pursue, protect and retrieve the stolen automobile was held to have terminated on September 2, 1974, a date preceding knowledge of its location in Baton Rouge, Louisiana. Consistent with the reasoning and principles engaged and applied in disposing of the second and final aspect of Point (2), the association's attempted condemnation of Instruction No. 3 fails.

■ Point (5) charges that the trial court erred in refusing to give association's requested Instruction No. D defining "theft or larceny" as used in Instruction No. 3, the insured's principal verdict directing instruction, because they are technical terms. Two salient matters should initially be mentioned and weighed in connection with Point (5). First, "Coverage G—Theft" under "Part III—Physical Damage" of the policy is cast in the following language: "To pay for loss to the owned automobile or to a non-owned automobile caused by theft or larceny". Although the policy throughout contains numerous definitions of certain terms used therein, none are to be found

defining "theft", "larceny" or "theft or larceny". Second, Instruction No. D requested by the association purporting to define "theft or larceny" obviously *treated* "larceny" and "theft" as interchangeable terms under the facts disclosed by the record in the instant case in that it gave a single, common definition to the term "theft or larceny", to wit, "[t]he term 'theft or larceny' as used in these instructions means a taking, without the owner's consent, with the intention on the part of the taker to deprive the owner of his property permanently". Although considered in a frame of reference other than jury instructions, it is appropriate to reiterate what was said in *Eiswirth Const. & Equipment Co. v. Glenn Falls Ins. Co.*, 241 Mo.App. 713, 240 S.W.2d 973, 977 (1951), with reference to the term "theft" as used in a policy insuring a truck against theft: "There is no definition of the word 'theft' in the policy nor is there any definition of that word in the statutes of this state. Therefore, the word 'theft' as used in the policy must be interpreted in its plain, ordinary and popular sense and not in a technical or scientific sense. *Dolph v. Maryland Casualty Co.*, 303 Mo. 534, 261 S.W. 330. The word 'theft' is defined in Webster's New International Dictionary Second Edition, Unabridged, page 2618, as follows: 'Act of stealing; specif., the felonious taking and removing of personal property, with intent to deprive the rightful owner of it; larceny. In various penal codes in the United States theft is defined so as to include embezzlement and in some cases "any unlawful acquisition of property."' In 2 Bouv. Law Dict., Rawle's 3d Rev., 3267, theft is defined as 'A popular term for larceny. It is a wider term than larceny and includes other forms of wrongful deprivation of property of another * * Acts constituting embezzlement or swindling may be properly so called.'" *World Investment Co. v. Manchester Ins. & Indem. Co.*, 380 S.W.2d 487, 490 (Mo.App.1964), notwithstanding recognition that there is a distinction between "theft" and "larceny" as used in a policy of insurance, and that "in popular usage 'theft' is a broader term than 'larceny'" held that "theft" was a word of

"common usage". In view of the fact that association's requested Instruction No. D deemed "larceny" as synonymous or interchangeable with "theft" under the facts surrounding the taking of insured's automobile, coupled with prior judicial recognition that "theft" is a word of "common usage", this court concludes that the trial court did not err in refusing to give association's requested Instruction No. D under the prevailing principle that "[t]he meaning of nontechnical, readily understandable phrases . . . need not be explicated." *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 944 (Mo.App.1978). Although it is possible to conceive of factual situations where a definition of "theft or larceny" might be necessary, such is not presently the case. Under the insured's evidence, which the jury obviously believed, a classic example of theft in the ordinary layman's mind, the stealing of an automobile, was all that was involved. Common sense dictates that the jury was not left adrift under the facts of this case by lack of an instruction defining "theft or larceny", or that failure to define the terms prejudiced the association. As an aside, a bizarre occurrence during association's counsel's closing argument to the jury appears to have effectively nullified any prejudice which the association might otherwise seek to attach to the trial court's refusal to give Instruction No. D. During the course of his closing argument counsel for the association advised the jury as follows: "I might say this, that you are not given a definition of what is theft or larceny. That is left up to your understanding, but I would suggest to you a definition as follows: That theft or larceny is a taking without the owner's consent, with the intention on the part of the taker to deprive the owner of his property permanently." Counsel for the insured immediately objected to this line of argument outside the presence and hearing of the jury and moved that it be stricken, both to no avail. Mention of this incident in no way implies its approval or condonation by this court.

■ Point (6) charges the trial court with error in giving insured's requested measure of damages instruction, Instruction No. 5, because it deviated from MAI 4.02 (Measure of Damages—Property Only) in that it cast the measure of damages in terms of "actual cash value" rather than in terms of "fair market value". Under "Part III—Physical Damage" of the policy of insurance in question, which includes "Coverage G—Theft", it is expressly stated under the heading "Limit of Liability" that "[t]he limit of the company's liability for loss shall not exceed the *actual cash value* of the property . .". (Emphasis added.) It is reasonable to assume that "actual cash value" was substituted in lieu of "fair market value" in Instruction No. 5 in an attempt to conform with the language of the policy. Moreover, the trial court gave Instruction No. 6 requested by the insured which defined the term "actual cash value" as follows: "The term 'actual cash value' means the price which the Cadillac automobile would bring when offered for sale by one willing but not obliged to sell it, and is bought by one willing or desirous to purchase it but who is not compelled to do so." This instruction, modified only by way of inserting "actual cash value" in lieu of "fair market value", and "Cadillac automobile" in lieu of "property in question", otherwise faithfully conformed to the first paragraph of *MAI 16.-02* [9] in effect at the time this case was tried. MAI 16.02 was revised in 1977 (effective January 1, 1978, a date subsequent to the trial of this case) by substituting the word "phrase" in place of the word "term" in the first sentence, and "Notes on Use" were appended for the first time which provide in part as follows: "When the phrase 'fair market value' is used, it must be defined.

9. "16.02 *Definitions—Fair Market Value Defined*

The term 'fair market value' means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and is bought by one willing or desirous to purchase it but who is not compelled to do so.
* * *"

In an eminent domain case use both paragraphs of the above definition. See MAI 31.05, MAI 9.01 and MAI 9.02. In other types of cases involving the fair market value of personal property, use only the first paragraph of the above definition. See MAI 4.02."

In *Myers v. American Indemnity Company*, 457 S.W.2d 468, 471 (Mo.App.1970), citing *Sun Ins. Office v. Rupp*, 64 F.Supp. 533, 537–38 (W.D.Mo.1946), it was said that " 'actual cash value' means 'the sum of money the insured goods would have brought for cash, at the market price . . . .' " Thus, "fair market value" and "actual cash value" in the perspective at hand, are substantially synonymous. A union of the policy language limiting the company's liability for "theft" loss to an amount not exceeding the "actual cash value of the property", Instruction No. 6 defining "actual cash value" and judicial recognition that "actual cash value" and "fair market value" are substantially synonymous terms, amply demonstrates that the jury was not misled and the association was not prejudiced by casting Instruction No. 5, the measure of damages instruction, in terms of "actual cash value" instead of "fair market value".

▇▇ Point (7) relied on by the association—that Instruction No. 5 (the measure of damages instruction) erroneously permitted the jury to award prejudgment interest from the date of the loss on any amount awarded to insured under the theft coverage of the policy—presents an issue which can be quickly resolved. Insured's claim under the theft coverage was unliquidated. The latest pronouncement of this subject appears to be *Fohn v. Title Ins. Corp. of St. Louis*, 529 S.W.2d 1, 5 (Mo. banc 1975), a case involving an action brought on a policy of title insurance. There, the court, with considerable dispatch, held that prejudgment interest could not accrue on an unliquidated claim. By the same token, prejudgment interest awarded to the insured in the amount of $577.50 in this case cannot stand.

▇▇ Point (8) seeks to charge the trial court with error for refusing to grant the association's request to pass and circulate to the jury during the course of the trial association's Exhibits 9, 10, 11, 12 and 13 and insured's Exhibit 26, same having been previously identified and admitted into evidence. A definitive judicial statement tangentially touching upon this issue is found in *Freeman v. Kansas City Power & Light Company*, 502 S.W.2d 277, 282–83 (Mo. 1973): "We agree with plaintiffs generally that once a court has determined that an item of evidence is admissible in a case, that evidence should be made available to the jury on an equal basis with all other evidence in the case. In the case before us, however, the court did not arbitrarily exclude this item of evidence from that sent to the jury, but determined that the nature of plaintiff's injuries was not an issue and reasoned that pictures of the injuries would not be helpful to the jury in their deliberations. This being the case, we cannot say that the court's action in this matter was error." Although the issue in *Freeman* was presented in the context of the trial court's refusal to permit an exhibit to be sent to the jury after it had retired for final deliberations, the basis for resolving the issue was implicitly premised upon recognition of the discretion reposed in trial judges in such matters and, concomitantly, limiting review on appeal to the more narrow issue of whether there was an abuse of discretion. More squarely in point are *Yeager v. Wittels*, 517 S.W.2d 457, 466–67 (Mo.App.1974), and *Wilkins v. Cash Register Service Company*, 518 S.W.2d 736, 747 (Mo.App.1975). *Yeager* and *Wilkins* both involved claims of error predicated on refusals to honor requests to have certain exhibits, which had previously been identified and admitted into evidence, passed and circulated to the respective juries during the course of trial. In both instances, claims of error were rejected on appeal by alluding to the discretion vested in the trial judge in such matters and collaterally finding no abuse of such discretion.

The association stated in the argument portion of its brief that "[t]he error of the court in failing to pass to the jury . . .

[association's] exhibits 9, 10, 11, 12 and 13 and . . . [insured's] exhibit 26 was *prejudicial because it kept from the jury the reason why . . . [insured] was prevented from obtaining his vehicle from Louisiana . . . .*" A review of the various exhibits referred to in association's Point (8), with one exception, discloses that they related essentially to the association's contention that the insured had a duty to pursue, protect and retrieve the stolen automobile after it was located in Baton Rouge, Louisiana. The one exception mentioned involved an isolated portion of an exhibit which can best be characterized as hearsay upon hearsay. Having heretofore held that *the insured's duty, if any, to pursue, protect and retrieve the stolen automobile terminated on September 2, 1974,* and after considering the highly questionable probative value of one of the exhibits, it cannot be said that the trial court abused its discretion in refusing to honor the association's request to pass and circulate the various exhibits to the jury during the course of the trial.

■ The association's final point charges that the trial court erred in refusing to admit association's Exhibit 5 into evidence, same showing B & G Motor Co. of K.C., Inc.'s, predecessors in title re the 1971 Cadillac Coupe DeVille and that a new certificate of title had never been issued in the name of the insured. To put this final point in proper perspective, attention is called to the fact that the association *conceded* during trial that the insured had an insurable interest in the 1971 Cadillac Coupe DeVille. The tack taken by the association is that the refused exhibit was relevant to the improperly extended issue injected by the association that the insured had a duty to pursue, protect and retrieve the stolen automobile after it was located in Baton Rouge, Louisiana. The record reveals that the only evidence presented to the jury by the insured regarding title to the stolen automobile was the certificate of title issued in the name of B & G Motors of K.C., Inc., and assigned by it to the insured. When these undisputed facts are juxtaposed with this court's disposition of the final aspect of Point (2) raised by the association, i. e., that *the insured's duty, if any, to pursue, protect and retrieve the stolen automobile terminated on September 2, 1974,* it may be said that Exhibit 5 was cumulative at least and irrelevant at best, and its exclusion was not prejudicial.

■ Having heretofore held that the judgment below erroneously awarded the insured prejudgment interest in the sum and amount of $577.50, and $385.00 as a penalty and $4,000.00 as a reasonable attorney's fee pursuant to Section 375.420, RSMo 1969, this court, in the waning portion of its opinion, is confronted with the ultimate disposition of this case as the effect of its opinion affirms the judgment below in part and reverses it in part. Pursuant to Rule 84.14, and under the authority of *Caen v. Feld*, 371 S.W.2d 209, 214–15 (Mo.1963), construing and applying Rule 83.13(c), present Rule 84.14's antecessor, this court is empowered to "give such judgment as the court ought to give" and "[u]nless justice otherwise requires", it "shall dispose finally of the case". Consistent therewith, the judgment below is affirmed with respect to the sum of $3,850.00 awarded to insured as damages for theft of his automobile, and reversed with respect to the sum of $577.50 erroneously awarded as prejudgment interest, and the sums of $385.00 awarded as a penalty and $4,000.00 awarded as an attorney's fee pursuant to Section 375.420, *supra*.

Accordingly, the judgment appealed from is affirmed in part and reversed in part and the case is remanded to the trial court with directions to enter a new judgment in favor of the insured and against the association in the corrected sum and amount of $3,850.00 and for costs.

All concur.