Benjamin Frank CAIN, et al., Plaintiffs,

v.

TRANS WORLD AIRLINES, INC., Defendant.

No. 78 CIV 2119 (LBS).

United States District Court, S.D. New York.

June 3, 1982.

964

DePetris & Stewart, New York City, Ronald E. DePetris, for plaintiffs; Carl I. Stewart, New York City, of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, Paul G. Pennoyer, Jr., Thomas A. Dubbs, Henry Pitman, for defendant; Thomas J. Hall, New York City, of counsel.

## OPINION

SAND, District Judge.

The 57 individual plaintiffs in this action were at one time employed by the defendant, Trans World Airlines, Inc. ("TWA"), in Saudi Arabia. TWA utilized their services in connection with a management agreement it had with the Saudi Arabian Airlines Corporation ("Saudia"). In 1976, the defendant advised the plaintiffs that they would be terminated from TWA employment, but that they would have the option of becoming direct employees of Saudia. Thirty-three of the plaintiffs chose to become Saudia employees and 24 plaintiffs sought other employment. All 57 plaintiffs claim that TWA's conduct constitutes a breach of their employment contracts and negligent misrepresentation.[1] After 41 days of trial, the jury found damages on the breach of contract claim only, in an amount totalling approximately $1,748,300.

TWA has moved for judgment notwithstanding the verdict pursuant to Rule 50(b)

---

1. The liability and damages phases of this action were tried on a bifurcated basis by the same jury. During the liability phase, the jury found for the defendant on a claim of fraudulent misrepresentation.

of the Federal Rules of Civil Procedure, based primarily on the alleged inadequacy of plaintiffs' proof of a claimed element of damages usually referred to at trial as "Domestic · Firm Preference" (hereinafter "DFP"). The plaintiffs have cross-moved for a determination by the Court as to pre-judgment interest, and for a new trial on damages pursuant to Rule 59 of the Federal Rules of Civil Procedure, on the ground of the inadequacy of damages.

### A. *History of the DFP Issue*

[1] In addressing TWA's motion for judgment notwithstanding the verdict, we must first briefly sketch the history of DFP in this case. When the issue first came before the Court, this element of damages was described as the premium attached by Americans to employment by an American Company, as it is determined by the market. At that time, the Court included within DFP the following four elements:

"1. American Social Security benefits.
2. Physical security and availability of evacuation plans.
3. Possible reassignment to the States whether as a matter of contractual obligation or simply a possible opportunity which was enhanced by employment by an American company.
4. Greater job security in the event of political or social upheavals in a volatile part of the world, etc."

(Tr. 862).

The Court ruled that the jury would be permitted to decide whether DFP exists, and if so, to evaluate it. (Tr. 863). However, the Court noted that the problems of proof with respect to the premium were "formidable." (Tr. 863). The Court then suggested how the plaintiffs might best prove the element of damages:

"The clearest, most objective evidence would be a statistical presentation demonstrating that the pay scales of American employees of American companies in Saudi Arabia were lower than those for Americans doing comparable work for the Saudi employers in Saudi Arabia—

thus evidencing that the marketplace recognizes and reflects the existence of the premium for an American employer.

Expert testimony by a personnel recruiter for Saudi Arabian employment in 1976 might also be helpful and competent on this subject." (Tr. 863–64).

This latter suggestion was repeated frequently during the trial.

During the plaintiffs' case, a number of the individual plaintiffs testified that if they had been given a choice between staying with TWA or becoming Saudia employees at a 15 percent higher salary, they would have remained TWA employees. These plaintiffs listed various reasons for this hypothetical decision, including perceived benefits in travel allowances, payment in American currency, retirement provisions, TWA reassignment rights, and physical security.

The sole witness to testify during the damage phase of the case in support of the existence and value of DFP was the plaintiffs' expert, Dr. Stephan Michelson. Michelson first testified outside the presence of the jury on January 6, 1982, on voir dire. Michelson described his methodology in assessing DFP as follows:

"I am assuming, I was told I could assume or should assume, that each of these plaintiffs rejected an offer 15 percent above their TWA salary, rejected in the sense they would not voluntarily have gone from TWA to Saudia for 15 percent increase.

That, of course, is the concept we're aiming at: What percentage increase in pay would have enticed them to go from TWA to Saudia while both were possibilities? That is what this concept is about and 15 percent is, I am told, now, a floor. That's not enough.

If I have observed as an economist that they [the plaintiffs] have rejected a 15 percent offer to voluntarily move from TWA to Saudia, now my problem is to

state a number that would be enough to get these people to move, and, of course, all I can try to do is find a low number.

The proper number could be 100 percent. I would not know that. We have to deal with what I do know and that is that 15 percent is too low so there are two principles I follow.

One principle I follow is how do negotiations occur if one rejects an offer of 15 percent? What's the next offer?

The answer to that is almost unvariably 20 percent.

I'm not claiming that no one would have taken the 20 percent offer. I don't know that. But I now ask, given a rejected 15 percent offer and the next offer would be 20 percent, I ask how is human behavior distributed?

If we had 57 people and were in a one-on-one negotiating situation, what would happen? Would everybody accept the 20 percent?

That's a matter of common experience and common knowledge. Any economist would tell you that's where demand and supply curves come from.

It's not true that everybody flocks to buy at any given negotiation price. When the price of a car is reduced $100, some people may buy it, but not everybody.

So I can assume there is a distribution of percentages that probably starts at 20 and goes to some value I don't know. These are percentage increments in salary which would induce people to leave TWA and go to Saudia if they had been asked.

Given a distribution of percentages whose floor is 20, then I can say that 25 percent is the lowest likely average and that any other averages, if one can calculate these averages, would be higher, but I don't know how much higher they would be, so I stick with the number that I say is the lowest conceivable average of all these percentages.

Q  Is that it?

A  Yes.

Q  Nothing else?

A  No."

(Tr. 4346–49).

After further colloquy with Michelson, the Court ruled that he was not competent to testify regarding DFP. The Court stated that the process of going from 15 percent to 25 percent was a purely arbitrary one,

"based on some assumptions which I believe are not valid in this case and with a total disregard of considerations which would be operative in a real world situation. . . . We do, of course, have the testimony of plaintiffs that 15 percent was not enough. But how much more the plaintiffs might have sought and Saudia would have been willing to pay in negotiation of that question is simply not presented in a way which would enable anything other than the purest of speculation." (Tr. 4383–84).

The Court initially ruled that, for the purposes of the plaintiffs' damages charts, DFP was to be limited to 15 percent. However, after further discussion of plaintiffs' contention that DFP was *at least* 15 percent, assurances from plaintiffs' counsel that such evidence as that of a Saudi personnel recruiter was unavailable, defendant's assertion that it also had located no such expert testimony, and the posing of additional hypothetical questions to Michelson, the Court modified its ruling and permitted plaintiffs' damages charts to include both a 15 percent column and a 25 percent column for DFP. (Tr. 4421).

Notwithstanding TWA's statement on January 6, 1982 that despite the sums at issue in this case and the length of time the issue had been pending, it had not located an expert on personnel recruiting for Saudi employment, (Tr. 4413), TWA made an offer of proof the very next day of exactly such evidence. The Court adhered to its previous ruling.[2]

Michelson testified before the jury about DFP on January 8, 1982, at which time he

---

**2.** When TWA's expert, Dr. Dwyer, testified at trial, he stated that, as a marketplace phenomenon, DFP either does not exist, or if it exists, it has no value.

stated that, in order to place a value on this element, he had to assume that the TWA and Saudia jobs were equal. (Tr. 4568). The Court pointed out that this assumption was contrary to the record, and contrary to the plaintiffs' own damage calculations which showed many differences between the jobs. The Court also inquired with respect to possible duplication of plaintiffs' claims for damages since DFP, calculated in plaintiffs' charts, included items which were separately evaluated in other columns of the charts. The plaintiffs responded by limiting their definition of DFP to job and physical security. After the Court rendered an Opinion tracing the evolution of DFP in the case and stating its continued dissatisfaction with the plaintiffs' methodology, the plaintiffs requested permission to recompute their damage charts in such a way that the TWA and Saudia positions were "equalized," so that the only variable was DFP. The Court permitted such a recalculation, warning the plaintiffs that this was their "last bite of the apple." (Tr. 4642).

During this phase of the case, the positions of the parties and their representations to the Court were in a constant state of flux, in part, and most significantly, because of the economic impact of the Court's decision (made promptly upon the final submission of affidavits on the matter) that if the plaintiffs had stayed with TWA they would not have been able to recover "length of service awards" provided for by the labor laws of Saudi Arabia. The consequence of this ruling was to make employment with Saudia more lucrative as compared to TWA employment and when the case resumed on Monday, January 11, 1982, the plaintiffs conceded that, on the average, the Saudia package of wages and benefits was 18.4 percent better than the TWA package.

Plaintiffs revised their damage calculation pursuant to their request and Michelson concluded that since the packages were now otherwise equal, the only variable accounting for the value of his hypothetical negotiated offer was "TWA security."

The Court, in permitting Michelson to testify before the jury, stated: "The persuasiveness of plaintiffs' theory and method of showing that is, in the first instance, a matter for the jury." (Tr. 4675). This ruling was consistent with the Court's previous statement that it would require a special verdict on DFP "so that the matter might be subject to post-verdict adjustment." (Tr. 4617–18. See also Tr. 4432–3).

Michelson testified before the jury as follows:

"You are in a negotiating situation, and there is no question that I have to project what the negotiation would be like because it didn't happen. And so let me lay out the scenario as I see it.

In a negotiation with an individual or a group of individuals, in which an offer has been made and rejected, in which the offering party—Saudia—wants these people, in which Saudia wants them badly, its next offer will be what I call a noticeable increase from the previous offer. In other words, if they have phrased an offer as 'We will offer you 15 percent over your previous salary,' and that's the language of the offer, the next offer is then not 16 percent. It's similar to any situation in which one party wants to change a price and see some behavior.

If a clothing store discounts a $200 suit, it does not discount it to $199 if it wants to see anybody come in and buy the suit because of the discount. It makes a noticeable offer. It is a way you get people's attention; it's a way you get deals made, for people to agree on the price.

Given the language, one would think that the next offer from 15 percent would be 20 percent. Saudia would say: Okay, 20 percent.

Now, it's not beyond the realm of possibility that some of the plaintiffs would have said yes. I don't know that they wouldn't have. I am starting with the assumption that they rejected 15 percent in a free-market situation, and they now get a noticeable offer.

Do they all reject it? I don't claim that. I don't know that. But now we have to talk about how people respond to offers.

We know that when the $200 suit is discounted to $150, some people come in and buy it. It's a noticeable offer. It's a $200 suit. It's now $150. You've got my attention, I will come in. And we also know that other people don't. Responses to offers are spread over a range.

That's why in economics there are supply curves and demand curves, because every time the price changes, somebody responds but somebody else doesn't.

So I am prepared to believe that the next offer would have been 20 percent and that some people would have accepted it. I can't tell you who. Because I don't have that kind of information. I am just saying that given what I know about negotiation situations and how some people are usually fairly close to the point at which they would make a move, somebody would accept that offer, but some wouldn't. I am now after an average value.

I then do not contend that Saudia would say: Okay, we didn't get enough of you at 20 percent, how about 25 percent? That's not the way negotiations go, often, always. They have made the noticeable offer; they had made the first big, attention-grabbing offer.

I really don't have much of a scenario after that. There's negotiation. It may be in the form of things that don't look like money. But we have already seen that it all can come down to money. It might be that we will pay you U.S. dollars. All right, but that's a 2 percent offer, a 2 percent better package. Maybe things like that.

All I have to try to do now is to project out the range of offers and acceptances. Well, I am talking about Saudia's money, and I have a few ideas of their willingness to spend money, and I do know that they value people who have been there more than two years a lot because the average person who comes, they expect to leave in two years, and these people didn't.

So in my mind I see some deals being made at quite high figures.

. . . . . .

I end up with 25 percent—that is, a 10 percent better offer. 25 percent phrased in the original language. Here's 15 percent. Okay, we will make our next good offer at 20 percent. We will give it to you in U.S. dollars, which is the equivalent of 22 percent. So getting 22 percent more will accept it, of course. I simply end this at 25 percent because I don't really know how far beyond that Saudia is willing to go.

So I have to come up with some reasoned opinion, some opinion that I can say that I think would happen, and I come up with 25 percent. We will never know the correct answer." (Tr. 4737–41).

### B. *Conclusion*

After reviewing the evidence adduced at trial, the Court finds that there is an absence of any reliable testimony that DFP exists in the marketplace, or that if it does exist, that it exceeds the 18.4 percent by which the Saudia package was conceded to be better than the TWA package.

Plaintiffs' theory of DFP is grounded upon particular plaintiffs' testimony that had they been given a choice, they would have remained in their positions with TWA rather than become Saudia employees in comparable positions, with a 15 percent wage increase. This is, of course, testimony of an entirely hypothetical nature since the plaintiffs were never afforded such a choice. These statements are, therefore, conjectural and speculative, and are prone to being self-serving, subjective, and incapable of effective analysis by cross-examination. Furthermore, the plaintiffs who made these statements did not isolate DFP. Rather, they asserted that they would have preferred continued TWA employment for numerous reasons other than security (*e.g.,* travel, retirement and currency benefits). As the Court indicated in a previous Opinion: "There is no basis on the record in this case to conclude that the plaintiffs perceived, or that a reasonable employee in the marketplace would have perceived, security as being the key factor in the differences or

so overwhelming a factor in the differences so that one can conclude that the rejection, the hypothetical rejection, of a 15 percent premium is because of the security factor alone." (Tr. 4620). In addition, the plaintiffs made their statements on the basis of an incomplete knowledge of the relative benefits of the TWA and Saudia packages. For example, it was only in the context of litigation that benefits had precise mathematical values attributed to them, and it was not until the Court's length of service award ruling, after the time of the plaintiffs' testimony, that it was determined that if plaintiffs had remained with TWA, they would not have received substantial sums in the form of length of service awards. These factors all undermine reliance on plaintiffs' statements about their preference for TWA employment as the basis for a finding that DFP exists in the marketplace in an amount which may be ascertained to be more than 18.4 percent.

The only other evidence upon which the plaintiffs rely is Dr. Michelson's testimony. The Court has previously expressed its skepticism toward Michelson's methodology (*see, e.g.,* Tr. 4383, 4391–93), and agrees with the defendant that Michelson's testimony "is effectively grounded on an imagined negotiation that 'didn't happen.'" (Defendant's Brief at 1–2, citing Tr. 4737–38). Even if we were to credit the plaintiffs' testimony as to their hypothetical preference for TWA employment, and we were to attribute all of this preference to "security," there is absolutely no rational basis for saying that if a plaintiff turns down a particular offer, the next offer will be five percent higher, and the ultimate average negotiated figure would be five percent higher than that. As the Court has stated, this "is a numbers game of the purest sort," (Tr. 4392), and having no basis in objective fact, it is not probative on the issue of DFP.

The Court is well aware of the doctrine that where the existence of damage is certain, the burden of uncertainty as to the amount of damages is upon the wrongdoer, and that the plaintiffs need only show a stable foundation for a reasonable estimate of their damages. *See Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926–27 (2d Cir.1977). However, in this case, the existence of damage is not certain, and, even viewing the evidence in the light most favorable to the plaintiffs, there is no stable foundation upon which the jury could have made a reasonable estimate of DFP. The Second Circuit Court of Appeals has repeatedly and clearly stated that, after giving the non-movant the benefit of all reasonable inferences,

> "the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him."

*Mattivi v. South African Marine Corp.,* *"Huguenot,"* 618 F.2d 163, 168 (2d Cir.1980).

For the reasons listed above, this Court is of the opinion that the plaintiffs' evidence in support of the amount of their security preference depended entirely upon utter speculation, and therefore fails to survive the first prong of the *Mattivi* test. On the record in this case, there is absolutely no reasonable basis on which the jury could have found plaintiffs permitted to recover for this element of damages.

Since DFP was the only element of damages assessed in favor of the 33 plaintiffs who remained employed by Saudia, these plaintiffs are entitled to no damages.[3] The

---

**3.** The jury was given a special verdict form for each of the 57 plaintiffs. Question 2 read: "Do you find that Americans, with background and experience similar to plaintiffs, employed in Saudi Arabia, would receive a higher salary and benefit package from a Saudi Arabian company than from TWA because of a prefer-

ence by Americans for TWA security?" The jury answered this question "No" for each and every plaintiff.

Question 2(a) read: "If your answer to question 2 is yes, what is the amount, if any, by which such package would be greater than 18.4% of the TWA package and which you

Court therefore grants the defendant's motion for judgment notwithstanding the verdict as to these 33 plaintiffs.[4]

### Mitigation of Damages Re 24 Plaintiffs Who Left Saudia

■ The twenty-four plaintiffs who left Saudia suffered damages by virtue of the income and benefits they lost when they were terminated by TWA. The defendant asks the Court to set aside the verdict for these plaintiffs, arguing that as a matter of law, they failed to mitigate damages by refusing the superior Saudia position. This issue is governed by Missouri law.

The Missouri courts have stated that "a former employer meets its burden of proof of mitigation of damages if the employer proves that (a) one or more discoverable opportunities for comparable employment were available in a location as, or more convenient than, the place of former employment, (b) the improperly discharged employee unreasonably made no attempt to apply for any such job, and (c) it was reasonably likely that the former employee would obtain one of those comparable jobs." *Stewart v. Board of Education of Ritenour Consolidated School District R–3,* 630 S.W.2d 130 (Mo.App.1982) (unpublished), *quoting Ryan v. Superintendent of Schools of Quincy,* 374 Mass. 670, 373 N.E.2d 1178, 1181 (1978). It is clause (b)—the *reasonableness* of a plaintiff's decision to seek employment other than with Saudia—that is at issue here.

As the Court has explained above, the plaintiffs' knowledge of the relative advantages of the Saudia package was imperfect

---

have therefore awarded as net damages with respect to this element?" This question was left blank on each special verdict form.

Question 3 read: "What are the plaintiff's net damages, if any, for breach of contract?" Differing amounts were filled in for this answer as to each plaintiff, including those who remained with Saudia.

In a robing room conference, after inquiry by the Court, counsel for TWA pointed out the apparent inconsistency between the jury's answers to questions 2 and 3, given the plaintiffs' concession that the only element of damages recoverable by the 33 plaintiffs who stayed in Saudia was DFP. Counsel for both the plaintiffs and the defendant agreed that the matter should be called to the jury's attention, and that the jury should be permitted to reconsider its verdict as to those 33 plaintiffs. The Court took this action, and the jury soon sent a note *to the Court further explaining its verdict.* The note indicated that the jury found the existence of DFP in the amount reflected in the answer to question 3, and that the jurors were under the impression that if they had utilized the same figure in both questions 2(a) and question 3, the result would have been a duplicate award. However, the jury stated that it was adhering explicitly to the amount awarded in the answers to question 3.

*The jury was never asked to reconsider its* finding that the 24 plaintiffs who left Saudia were entitled to no damages for DFP. Although an argument might be made to the contrary, in response to an inquiry from the Court, both the plaintiffs and the defendant have stated that, in their view, the jury's damage awards to these plaintiffs do not include any amount which may be attributed to DFP.

Plaintiffs' Supplemental Memorandum of Law at 2–3; Defendant's Supplemental Memorandum of Law at 9. In fact, the defendant has stated that "[i]f the Court should find, on its own motion, that the verdicts awarded to the twenty-four plaintiffs who left Saudia contain awards for Domestic Firm Preference, TWA does not seek a new trial on this ground." Defendant's Supplemental Memorandum of Law at 11 n.*.

4. The plaintiffs have argued that, if the Court concludes that DFP was not a proper element of damages, it should grant a new trial rather than enter a judgment notwithstanding the verdict. Plaintiffs support this contention by arguing that the jury might have found damages for elements other than DFP and by asserting that, had they known DFP was not a recoverable element of damages, the plaintiffs would have made different tactical decisions at trial. *See* Plaintiffs' Supplemental Memorandum of Law at 7–9. The Court rejects these arguments. The jury's verdict forms and note to the Court following its verdict clearly indicate that the amount of damages awarded to the thirty-three plaintiffs who stayed with Saudia was solely attributable to DFP. See pp. 969–970, n. 3. Furthermore, as the history of DFP outlined in this Opinion demonstrates, the Court's repeated questioning of plaintiffs' method of proof of this element, its statements of dissatisfaction with that proof, its many rulings on the subject, and its explicit warnings that any award of DFP would be subject to post-verdict review provided ample notice to the plaintiffs that they made tactical decisions to rely on DFP at their own peril.

at the time of the breach and thereafter,[5] a fact from which a jury might justifiably conclude that a plaintiff's behavior in looking for alternate employment was reasonable. Even more obviously, TWA *conceded* during the trial that some of the plaintiffs who left Saudia and subsequently returned were entitled to damages. *See* Defendant's Exhibit XB, TWA Damage Charts for Plaintiffs Copeland, Leili, and Wombacher. Since TWA admitted that these plaintiffs may recover damages for the breach of contract, it is patently reasonable for a jury to find that those plaintiffs who did *not* return to Saudia also may recover damages.

Since a jury might reasonably have concluded that the defendant did not satisfy its burden of proving a failure to mitigate damages, the defendant's motion to set aside the jury's verdict as to the twenty-four plaintiffs who left Saudia is denied. Moreover, this Court is of the opinion that, based on the evidence in this case, the amount of the jury's award to these plaintiffs was reasonable. The plaintiffs' motion for a new trial on the ground of inadequacy of damages is therefore also denied.

*Cross-Motion for Pre-Judgment Interest*

■ The Court must consider, as to the 24 plaintiffs who left Saudia employment, the plaintiffs' cross-motion for pre-judgment interest. This issue is to be determined by the law of Missouri. The Court ruled before trial that Missouri law governed the plaintiffs' contract claims, this determination was consistently reaffirmed by the Court during the trial, and the entire case was conducted and the jury charged in accordance with this choice of law decision. The issue of pre-judgment interest is a substantive one, and the law to be applied to it is the same as that governing the liability claim underlying the jury verdict. *See, e.g.,*

Berner v. British Commonwealth Pacific Airlines, Ltd., 230 F.Supp. 240, 245–46 (S.D. N.Y.1964), rev'd on other grounds, 346 F.2d 532 (2d Cir. 1965), cert. denied, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966); Banco Nacional de Cuba v. Chase Manhattan Bank, 505 F.Supp. 412, 448 (S.D.N.Y.), modified on other grounds, 514 F.Supp. 5 (S.D. N.Y.1980), modified on other grounds, 658 F.2d 875 (2d Cir.), rev'd on other grounds, 658 F.2d 913 (2d Cir.1981). New York choice of law principles may make exceptions to this rule in certain extraordinary situations in which New York has a strong interest in compensating particular plaintiffs. *See Kilberg v. Northeast Airlines, Inc.*, 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961) (strong public policy embodied in New York State Constitution prohibiting the imposition of limits on damages in wrongful death actions).[6] There is no such interest in the present case.

■ The defendant argues that pre-judgment interest may not be awarded in this case because the issue was not submitted to the jury as required by Missouri law. This argument is rejected. At a charging conference, the plaintiffs raised the question of interest, and proposed a procedure to obviate the need for submitting the issue to the jury. (Tr. 5728–32). Without conceding that such damages were recoverable, the defendant assented to this procedure, (Tr. 5730–32), and in reliance on that assent, the matter was not submitted to the jury. In this action, tried in federal court in New York, the defendant is bound by its agreement regardless of the procedure that might be applied were the case tried in a Missouri court.

■ The parties agree that under Missouri law pre-judgment interest is not al-

---

5. See p. 969, *supra.*

6. Although one court purports to apply the *Kilberg* exception in a case in which New York law merely provided for interest in an action against a surety and the parties did business in New York, this Court is of the opinion that the drastic expansion of *Kilberg* which one might infer from that court's language is not the law

of New York. *See Hunt v. Bankers & Shippers Insurance Co. of New York*, 73 A.D.2d 797, 423 N.Y.S.2d 718 (1979), *aff'd* 50 N.Y.2d 938, 431 N.Y.S.2d 454, 409 N.E.2d 928 (1980). Even if such a view of *Kilberg* were the state's law, it would not be applicable in this case since New York does not have a strong interest in these nonresident plaintiffs.

lowed where the amount due is neither liquidated nor readily ascertainable. The plaintiffs argue that such interest should be permitted in this case since, in a breach of contract case, there is "a recognized legal standard for the measure of damages: the amount of compensation for the remainder of the contract term, less any amounts which the employee earns or could have earned by the exercise of reasonable diligence during such period." Plaintiffs' Brief at 18. In support of this contention, the plaintiffs cite cases for the proposition that where the measure of damages is dependent on market value or where some elements in the damage formula are contingent, this is not a bar to recovery. *See* Plaintiffs' Brief at 16–24 and cases cited therein.

The most recent Missouri decisions are unfavorable to the plaintiffs' position. In *Pannell v. Missouri Insurance Guaranty Association,* 595 S.W.2d 339, 355 (Mo.App. 1980), the court reversed an award of interest where the fact that the measure of damages was the fair market value of an automobile was insufficient to make the claim liquidated. Similarly, the Supreme Court of Missouri summarily denied prejudgment interest in a case in which the amount due had to be established by expert testimony as to the value of real estate. *See Fohn v. Title Insurance Corp.,* 529 S.W.2d 1, 5 (Mo.1975).

This Court agrees with the defendant that the cases relied on by the plaintiffs are inapposite since they involve instances in which there was either no dispute as to the amount of damages, or in which the amount could be readily ascertained by reference to an easily obtainable market standard. *See, e.g., American Insurance Co. v. First National Bank,* 409 F.2d 1387, 1392 (8th Cir. 1969) (parties stipulated to information from which amounts due on bond could be readily computed), *Eastmount Construction Co. v. Transport Manufacturing & Equipment Co.,* 301 F.2d 34, 43 (8th Cir.1962) (amount due readily computed by multiplying price per cubic yard of topsoil by number of cubic yards delivered); *Laughlin v. Boatmen's National Bank,* 354 Mo. 467, 476–77, 189 S.W.2d 974, 979–80 (1945) (ac-

tion on account for services rendered); *Cannon v. Bingman,* 383 S.W.2d 169, 173 (Mo. App.1964) (action for rescission allowing interest on undisputed purchase price, which was wrongfully withheld by vendors). In the present case, there were so many seriously disputed elements of damages which went into the jury's calculations, that the action cannot be classed with those cases cited by the plaintiffs. Among the disputed elements of the damage computation in this case were the existence and amount of DFP, the contractual duration of the plaintiff's employment with TWA, the duration of TWA's Management Assistance Agreement, the size of annual raises the plaintiffs would have received with TWA, the value of lost travel benefits for each plaintiff, and the amount that each plaintiff could have earned through the exercise of reasonable diligence. It is clear to the Court that the amount due in this action was neither liquidated nor readily ascertainable. Hence, under Missouri law the plaintiffs' cross-motion for pre-judgment interest must be denied.

\* \* \*

### The Post-Trial Decision of the Primary Commission

Subsequent to the filing of the motions for judgment notwithstanding the verdict, for a new trial, and for pre-judgment interest, addressed above, the plaintiffs have moved for a new trial on the issue of damages or, in the alternative, for entry of judgment in an amount to be determined by the Court. The plaintiffs seek this relief on the grounds that a decision rendered by the Primary Commission in Saudi Arabia subsequent to the Court's ruling on length of service awards, and subsequent to the jury's verdict, indicates that the plaintiffs would have been entitled to length of service awards had they remained with TWA. The Court had ruled otherwise and had not reached the defendant's contentions that the plaintiffs' claims for length of service awards were time-barred and that the exclusive jurisdiction to rule on such claims lay in the Saudi Labor Commissions.

The Court, after thorough review of the subsequently rendered Saudi Arabian deci-

sion, adheres to its previous determination. Although the Court recognizes the limited extent to which Saudi Arabian law follows precedent, and that the Koran is the principal source from which that law emanates, the Court feels constrained to follow the reasoning of the higher tribunal (the Supreme Commission) with respect to the interrelationship of American Social Security and length of service awards. We note that the Primary Commission's recent decision in no way addresses the Supreme Commission's underlying rationale in *Doer v. Trans World Airlines, Inc.,* Exhibit 2 to Affidavit of Thomas J. Hall, January 4, 1982, that American Social Security and Saudi Arabian length of service awards are complementary and are not intended to be overlapping.

The plaintiffs have further moved for the imposition of sanctions against the defendant for having failed to call the regional tribunal's or the Primary Commission's decisions to the attention of either the plaintiffs or the Court. The defendant has cross-moved for an award of excess costs, expenses, and attorney's fees incurred by TWA on the grounds that the plaintiffs' motion relating to length of service awards was frivolous. These motions reflect the acrimony between counsel which existed throughout this case from discovery proceedings to date, and which made the Court's task more difficult and the attorneys' presentations less effective.

TWA contends that it had no duty to make the disclosure at issue. Obviously, whether or not such a duty to disclose exists is at least in part a function of the significance of the Saudi Arabian decisions. Were those decisions such events as to cause the Court to alter its previous opinion on length of service awards, any failure to disclose might be seen in a different light. However, the decisions in no way affect the Court's ruling, and both motions are denied.

Settle order and judgment.